EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
GRACE JUN: SBN 287973
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
TEL: (619) 233-1525
FAX: (619) 233-3221

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANKIE GREER,<br><br>              Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO *et al.*<br><br>              Defendants. | CASE NO. 19-cv-00378-JO-DEB<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS MOTION TO COMPEL INFORMATION AND MATERIAL REGARDING THE SAN DIEGO COUNTY SHERIFF'S DEPARTMENT'S CRITICAL INCIDENT REVIEW BOARD (CIRB)**<br><br>Hon. Daniel E. Butcher |

# Table of Contents

I.    INTRODUCTION ..............................................................................................1

II.   BACKGROUND .............................................................................................4

A.   Plaintiff Frankie Greer's *Monell* Claim Against County of San Diego ..............4

B.   The Primary Purpose of the Critical Incident Review Board Is to Oversee the
     Sheriff's Department's Tactics, Training, and Policy.........................................6

1.    The structure and function of CIRB make clear its communications with
      inhouse counsel are primarily for "business" purposes that are unrelated to
      seeking attorney advice. ..................................................................................6

2.    Rather than shrouding CIRB in secrecy to preserve attorney-client confidences,
      the Sheriff's Department prominently features CIRB as an internal body
      dedicated to police accountability and oversight. ............................................8

3.    The California State Auditor criticizes CIRB. ...................................................10

4.    Other external auditors criticize CIRB...............................................................13

5.    Instead of keeping the function of CIRB a secret to preserve the attorney-client
      privilege, Sheriff Gore publicly touts CIRB as a means for improving the
      safety and care of inmates in the Sheriff's custody...........................................15

C.   The County of San Diego in This Case Fails to Reference and Identify CIRB-
     Related Documents and Material It Identified in the *Silva* Case. ....................16

III.  ARGUMENT.....................................................................................................18

A.   By Failing to Make Any Particularized Showing Regarding Application of the
     Attorney-Client Privilege and Work-Product Privilege, the County Has
     Forfeited Its Claims. .......................................................................................18

B.  The Attorney-Client Privilege and Work-Product Privilege Cannot Apply to CIRB Reports and Material Because They are Routinely Generated for Business Purposes. .............................................................................23

C.  Because CIRB reports are routinely generated, they are not made in anticipation of litigation. ....................................................................26

IV.   CONCLUSION .............................................................................26

# I. INTRODUCTION

In September 2021, the Ninth Circuit answered a question that had long remained unresolved among the district courts in this Circuit: "[b]ecause this case squarely involves dual-purpose communications, we now answer the question that *Sanmina* left open. We hold that the primary-purpose test applies to attorney-client privilege claims for dual-purpose communications." *In re Grand Jury*, 23 F.4th 1088, 1092 (9th Cir. 2021). Thus, under the "primary purpose test," courts must determine "whether the primary purpose of the communication is to give or receive legal advice, as opposed to business or tax advice." *Id.* 1091. This means that communications with any attorney that may have more than one purpose "can only have a single 'primary' purpose." *Id.* The Ninth Circuit explicitly rejected arguments to apply broader protection of attorney-client communications:

> Applying a broader "because of" test to attorney-client privilege might harm our adversarial system if parties try to withhold key documents as privileged by claiming that they were created "because of" litigation concerns. Indeed, it would create perverse incentives for companies to add layers of lawyers to every business decision in hopes of insulating themselves from scrutiny in any future litigation.

*In re Grand Jury*, 23 F.4th at 1093–94.

With this new precedent from the Ninth Circuit, Plaintiff Frankie Greer moves this Court to resolve a question that has long bedeviled courts in the Southern District of California: whether the attorney-client privilege applies to reports and investigations conducted by San Diego County Sheriff's Department's Critical Incident Review Board (CIRB). [1]  CIRB reports are the only mandatory

---

[1] Courts in this district have issued differing opinions. *Compare Est. of Silva by & through Allen v. City of San Diego*, No. 18CV2282-L (MSB), 2020 WL 6741680, at *8 (S.D. Cal. Nov. 17, 2020) (finding the attorney-client privilege did not blanket every CIRB review) *and Medina v. Cty. of San Diego*, No. 08CV1252 BAS RBB, 2014 WL 4793026, at *15-*17 (S.D. Cal. Sept. 25, 2014) (attorney-

- 1

use-of-force investigation and review conducted by the Sheriff's Department when there is a death or serious injury while an individual is in custody.  Internal Affairs investigations are discretionary – there is no rule that IA investigations occur in every case of serious injury or death.  The Sheriff's Department has long claimed that CIRB reports and memoranda are subject to the attorney-client privilege because the Sheriff's Department's in-house counsel, its Legal Adviser, is present during the CIRB meetings.

The Sheriff's Department's own policy makes clear that communications during CIRB meetings have a dual-purpose: the board is to "consult with department legal counsel when an incident occurs which may give rise to litigation" (Plaintiff's Appendix Volume 2 at 78[2]) but the board is also supposed to vote to decide whether a Sheriff's Department employee violated policy, and determine whether changes to Department training and policy should be made (2 Appx. 79-80).  The Sheriff's Department has repeatedly pointed to CIRB as a mechanism for enforcing accountability.  It has publicly insisted that it proactively monitors potentially errant deputies who commit misconduct through CIRB. While using CIRB as a defense to any possible criticism that the Sheriff's

---

client privilege did not apply to Critical Incident Review Board report and records) with *Estate of Nunez v. Cnty. of San Diego*, 2017 U.S. Dist. LEXIS 146676, *3-*5 (S.D. Cal. Sept. 11, 2017) (sustaining attorney client privilege objection to production of specific Critical Incident Review Board report) and *Roger Bush et al. v. County of San Diego et al.*, No. 15CV686-L (JMA), ECF no. 22, Order dated November 25, 2015 (finding the Critical Incident Review Board report to be an attorney-client privileged communication).

[2] For ease of reference, Plaintiff has compiled all exhibits in support of his motion in an appendix that is submitted concurrently with this motion.  Plaintiff's appendix has two volumes and is bates numbered at the bottom right corner.  All references will be to the volume of the appendix and Plaintiff's bates-numbered page on the bottom right corner of the page.  Thus, "2 Appx. 79" means volume 2 of Plaintiff's appendix at bates-numbered page 79.

Department does not adequately investigate, monitor, and discipline personnel who inflict constitutional injuries, it contends that CIRB reports are not discoverable because they reflect meetings where CIRB is purportedly soliciting legal advice. But by repeatedly, and publicly, invoking CIRB, it has placed the quality and adequacy of the CIRB process at issue. In addition, the County has failed to make any showing that CIRB meetings are confidential and attended by the "client" with the intent of receiving legal advice. Rather, the CIRB policy makes clear that CIRB has a distinct "business" purpose – it is intended to monitor deputy tactics during events that resulted in a serious negative outcome, making such reports material to Plaintiff's *Monell* claim.

The law in the Ninth Circuit is now clear: an entity may not immunize all business discussions by simply placing attorneys in the same room – which is precisely what the Sheriff's Department does by requiring its Legal Adviser to be present during CIRB meetings. While the Sheriff's Department's Chief Legal Adviser, Robert Faigin, avers in this litigation that the "CIRB process and report are for key Sheriff's department personnel to consult with me as legal counsel to assess the Sheriff's department's potential civil exposure because of a given critical incident" (1 Appx. 46), that is contrary to his public statements regarding CIRB. In an article regarding CIRB uncovered through a Google search, Mr. Faigin wrote "[o]ne way that a law enforcement agency can meet the public's expectation of effective self-policing is through the establishment of a Critical Incident Review Board (CIRB)." (2 Appx. 87). He urges a police department's legal adviser to be a member of the CIRB process to "potentially provide[] the ability to protect the confidentiality of the discussion under the cloak of the attorney-client privilege." (2 Appx. 88). Mr. Faigin's article for Police Chief Magazine makes clear the real purpose of CIRB is not to have candid attorney-client communications to elicit attorney advice, but to conduct after-action reviews of "critical incidents" with the potential to improve training, policy, and discipline.

- 3

The attorney is simply present to provide the "cloak" of attorney-client privilege so plaintiffs such as Mr. Greer are unable to access relevant information.

Because the Ninth Circuit has affirmatively rejected this overbroad use of the attorney-client privilege to withhold key documents in discovery, Plaintiff Frankie Greer respectfully moves this Court to compel the production of CIRB reports, memoranda, and related information or other material.

## II. BACKGROUND

### A. Plaintiff Frankie Greer's *Monell* Claim Against County of San Diego

Plaintiff's *Monell* claim against the County of San Diego alleges the Sheriff's Department's failed to investigate, supervise, and discipline deputies and medical staff who have denied medical care to inmates who are known to have serious medical conditions.  Second Amended Complaint ("SAC"), ECF no. 59, at ¶¶ 264-280.  Plaintiff contends the County has a *de facto* custom of condoning constitutional violations by its subordinates by failing to adequately investigate, supervise, and discipline deputies and medical personnel whose actions or inactions have killed or seriously injured medically vulnerable individuals.  *Id*. ¶¶ 266-273.

For this reason, Plaintiff is seeking reports or memoranda related to internal reviews conducted by the Sheriff's Department's Critical Incident Review Board, which may have identified deficiencies in training or policy, or which may have recommended employee discipline, in 12 other cases where seriously ill inmates died in San Diego County jails before Mr. Greer suffered his injuries in this case.

A plaintiff pursuing a *Monell* claim against a municipal entity must identify a municipal policy or custom that caused the plaintiff's injury.  *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403-404 (1997).  "We have long recognized that a custom or practice can be 'inferred from widespread practices or 'evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded.'"  *Hunter v. County of*

- 4

*Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011).  The Ninth Circuit recognizes "that *evidence* of inaction—specifically, failure to investigate and discipline employees in the face of widespread constitutional violations—can support an inference that an unconstitutional custom or practice has been unofficially adopted by a municipality. We have also recognized that in some circumstances a *policy* of inaction, such as a policy of failing to properly train employees, may form the basis for municipal liability." *Id*. at 1234 n.8 (emphasis in original).  "[G]eneral evidence of departmental treatment of complaints and the use of force can" support a plaintiff's theory that "disciplinary and complaint process contributed to the police excesses complained of because the procedures made clear to the officer that he could get away with anything[.]"  *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1027 (9th Cir. 2015), *citing Larez v. City of L.A.,* 946 F.2d 630, 646–47 (9th Cir.1991) (alterations deleted).  A policy or custom can be found where evidence demonstrates "'it was almost impossible for a police officer to suffer discipline[.]"  *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001), *citing Larez*, 946 F.2d at 647.  "[I]t is sufficient under our case law to prove a 'custom' of encouraging excessive force to provide evidence that personnel have been permitted to use force with impunity."  *Rodriguez v. Cty. of Los Angeles*, 891 F.3d 776, 803 (9th Cir. 2018).

Once plaintiff identifies a custom or policy, the plaintiff must then show that the municipality adhered to the custom with deliberate indifference to the constitutional rights of the municipality's inhabitants.  *Castro v. County of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016).  The deliberate indifference standard is an objective one for municipalities.  *Id*.  "'Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or *constructive notice* that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied.'"

*Id.* (emphasis in original), *quoting City of Canton, Ohio v. Harris*, 489 U.S. 378, 396 (1989) (O'CONNOR, J., concurring).

In this case, CIRB reports regarding inmate deaths that occurred before Mr. Greer's incident will likely show the Sheriff's Department was aware of systemic deficiencies related to the failure to provide medical care or medical monitoring to inmates who were known to have a serious medical condition.  If Department officials were placed on actual or constructive notice that a recurring custom or practice was inflicting grievous harm on inmates, but took no action, Plaintiff will be able to demonstrate that the County's indifference was the moving force that caused the ultimate harm to Mr. Greer here.

**B. The Primary Purpose of the Critical Incident Review Board Is to Oversee the Sheriff's Department's Tactics, Training, and Policy.**

1. <u>The structure and function of CIRB make clear its communications with inhouse counsel are primarily for "business" purposes that are unrelated to seeking attorney advice.</u>

According to the Sheriff's Department's Policy and Procedure Manual ("Manual"), which sets forth the function and responsibilities of CIRB[3], CIRB is responsible for reviewing "critical incidents." This includes in-custody deaths; uses of deadly force; events where death or serious injury result; and incidences involving discharge of a firearm, major property damage, or major vehicle damage.

---

[3] The San Diego County Sheriff's Department Policy and Procedure Manual was downloaded from the Sheriff's Department website, https://www.sdsheriff.net/documents/pp.pdf, on August 20, 2020.  The 456 page Manual was neither paginated nor dated.  Excerpts from the Manual pertaining to CIRB were submitted in the *Estate of Paul Silva et al. v. County of San Diego et al.* case, S.D. Cal. case no. 18-cv-2282-L-MSB, at ECF no. 136-4.  The County of San Diego submitted the same policy in the *Silva* case, which can be found at ECF no. 137-3 at pp. 6-8 (page citations are to the ECF header).  The exhibits plaintiffs filed in the *Silva* matter related to their motion to compel CIRB reports and information are submitted concurrently in Volume Two of Plaintiff's appendix in this case.  *See* Declaration of Grace Jun at ¶¶ 10-20.

- 6

(2 Appx. 79).  The Lieutenant of the Division of Inspectional Services oversees the investigation of the "critical incident" and ensures that a copy of all reports, audio, and video recordings are forwarded to CIRB for its review.  (2 Appx. 78).

CIRB consists of three "voting" members: a commander from the Law Enforcement division of the Sheriff's Department; a commander from the Court Services' division; and a commander from Detention Services.  *Id*.  There are two "non- voting" members: the Chief Legal Advisor and a commander from Human Resources.  *Id*.

CIRB review meetings are attended by CIRB members; other members of the Sheriff's command staff; representatives from various training divisions and medical personnel; and representatives from Sheriff's legal department.  (2 Appx. 119)[4].  The Sheriff, the Legal Adviser, or any of the CIRB members can request certain personnel to be present.  (2 Appx. 119-120).  CIRB reviews of in-custody deaths typically feature a homicide detective who led the investigation as a presenter.  (2 Appx. 120).

At the conclusion of CIRB's review, the three voting members will vote to determine whether a deputy violated policy during a critical incident.  (2 Appx. 79).  If so, the case is forwarded to Internal Affairs for further investigation of the individual deputy.  (*Id*.).  CIRB is authorized to identify training issues and make recommendations for training.  (2 Appx. 80).  CIRB can also recommend changes to policies based on its review.  (*Id*.).  Within 45-days of the CIRB meeting, the Lieutenant of the Division of Inspectional Services will write a report summarizing the actions and conclusions of the board.  (*Id*.).  "The CIRB report shall contain specific findings with regard to whether the review board found any policy violations, and training or policy issues, as well as what actions were taken by the

---

[4] The Fed. R. Civ. P. 30(b)(6) deposition of Sergeant Meleen occurred in *Birtcher v. County of San Diego*, case no. 18-cv-1541-MMA-LL.  Deputies killed Mr. Birtcher on October 14, 2017.

department."  (*Id*.).   "Within seven (7) days of the CIRB, the Facility or Unit Commander, from the employee's chain of command, will meet with the employee and debrief them as to the results of the CIRB.  The Facility [or] Unit Commander will submit in writing to the Lieutenant of the Division of Inspectional Services that the meeting has taken place."  (*Id*.).

The only mandatory review of deputy conduct related in-custody deaths occurs through CIRB.  (2 Appx. 118).  CIRB is the only mandatory review of whether the tactics used by deputies were proper and consistent with their training. (*Id*.).  The Sheriff's Department's Division of Inspectional Services (DIS) is responsible for doing all use-of-force reviews.  (2 Appx. 116-117).

There is no mandatory investigation by Internal Affairs (IA) of any in-custody death. [5]  (2 Appx. 125).  Internal Affairs will investigate an in-custody death when a matter is referred to IA by command staff or through CIRB.  (*Id*.).  A civilian complaint about an in-custody death would not necessarily trigger any mandatory Internal Affairs review.  (*Id*.).  Whether IA investigates a civilian complaint would depend on the seriousness of the complaint.  (*Id*.).

2.  <u>Rather than shrouding CIRB in secrecy to preserve attorney-client confidences, the Sheriff's Department prominently features CIRB as an internal body dedicated to police accountability and oversight.</u>

The Sheriff's Department repeatedly cites to CIRB as evidence of police "oversight."  For example, in a document entitled "A Glimpse Into Our Policies," https://www.sdsheriff.net/documents/UseOfForcePoliciesProcedures.pdf (last accessed October 15, 2020) [submitted at 2 Appx. 81], the Sheriff's Department states it is "dedicated to building a culture of trust with our communities. . . . The Department is also proactive in the identification of possible opportunities for

---

[5] The deposition of Lieutenant Knobbe also occurred in *Birtcher v. County of San Diego*.  The term "in custody death" was defined as "[a]ny death occurring during or within close temporal proximity or time of a use of force either in a patrol or a jail setting but not including deputy-involved shootings."  (2 Appx. 124).

change in our policies, procedure, and training to affect consistent positive outcomes.  We are committed to impartial and compassionate enforcement of the law."  At the end of the document, the Sheriff's Department prominently lists CIRB as an example of oversight within the Sheriff's Department.  (2 Appx. 81).

On June 9, 2020, shortly after the eruption of nationwide protests in response to the death of George Floyd, the Sheriff's Department released a "Use of Force Fact Sheet," https://www.sdsheriff.net/documents/use_of_force.pdf (last accessed October 15, 2020) (submitted at 2 Appx. 83).  The document states the San Diego Sheriff's Department does not "condone nor accept any racial profiling or acts of brutality. We take immediate action on any such complaint and conduct a comprehensive investigation. Not only are there readily accessible means for individuals to make complaints or notify the department about any possible mistreatment, **but the Sheriff's leadership team reviews all critical incidents to ensure proper and just responses were administered**. We are also proactive in the identification of possible opportunities for change in our policies, procedure, and training to affect consistent positive outcomes."  (2 Appx. 83).  Later, the document describes the Critical Incident Review Board.  "The focus of the CIRB is to assess the department's civil exposure as a result of a given incident *and* to improve service delivery."  (2 Appx. 84).  "CIRB carefully reviews the incidents from multiple perspectives-including training, tactics, policies, and procedures-with the goal of identifying problem areas and recommending remedial actions."  *Id*.

In June 2011, Robert Faigin, the Chief Legal Adviser to the Sheriff's Department, authored an article entitled, "Critical Incident Review Board: Creation and Refinement," https://www.policechiefmagazine.org/critical-incident-review-board-creation-and-refinement/ (last accessed September 18, 2020) [submitted at 2 Appx. 86-92].  The article begins as follows:

> Now that almost every cellular phone has a camera, scrutiny of law enforcement is higher than ever before. Sites such as YouTube can broadcast the actions of law enforcement worldwide within minutes of a law enforcement contact.
>
> Consistent with the public's microscopic examination of law enforcement is the expectation that law enforcement agencies will police themselves to ensure that police officers perform in accordance with laws and with departmental policies and procedures.
>
> One way that a law enforcement agency can meet the public's expectation of effective self-policing is through the establishment of a Critical Incident Review Board (CIRB).

(2 Appx. 86).

Mr. Faigin's article demonstrates that the purpose of CIRB is not to provide legal advice to the Sheriff's Department command staff, but to help the Sheriff's Department identify problems.  "CIRB is designed to help an agency review a critical incident, assessing both the positive and negative aspects of that incident. Without a review process, negative aspects of a law enforcement contact may go undetected. A department's lack of knowledge of issues resulting from a critical incident will certainly cause the department to be slow in taking remedial measures to address the incident or the conduct that caused the incident."  (2 Appx. 87).  Mr. Faigin notes, "[f]ailure to take action when called for can cause an agency to be liable for being deliberately indifferent to a known risk of harm."  (2 Appx. 88).  The presence of an attorney on CIRB serves a secondary purpose: a legal advisor "**potentially provides the ability to protect the confidentiality of the discussion under the cloak of the attorney-client privilege**."  (*Id*.) (emphasis added).

3. <u>The California State Auditor criticizes CIRB.</u>

On February 3, 2022, the California State Auditor Report issued a report regarding the disproportionately high number of inmate deaths in San Diego

- 10 -

County Jails.  Auditor of the State of California, *San Diego County Sheriff's Department It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody*, February 2022, Report 2021-109, https://www.auditor.ca.gov/pdfs/reports/2021-109.pdf (last accessed March 25, 2022).  The State Auditor described CIRB as follows:

> The Sheriff's Department's investigators present to the board the facts and circumstances related to an in-custody death. According to department policy, the board then carefully reviews the incident from multiple perspectives, including training, tactics, policies, and procedures. Its ultimate goal is identifying problem areas and recommending remedial actions—such as posting a training bulletin or changing a policy—so that potential liability can be avoided in the future. According to policy, if the board votes to determine that any policy violations exist, it will forward the case to Internal Affairs.

*Id*. p. 36[6].  The Sheriff's Department's homicide unit typically presents facts about in-custody deaths to the Critical Incident Review Board.  *Id*. p. 38.  "Even though the information that the homicide unit presents to the Critical Incident Review Board is a key component of the Sheriff's Department's review of in-custody deaths, the Critical Incident Review Board ultimately decides whether to take further action."  *Id*.

Although CIRB meets to discuss in-custody deaths, "it has not always taken meaningful action to prevent deaths, even when it identifies problems with its policies and practices."  *Id*. at p. 36.  While CIRB may discuss issues in some meetings, "it ultimately concluded them without making recommendations for addressing these issues.  For example, in six of the 18 cases, the board indicated that the events surrounding the deaths in question could merit changes to policy

---

[6] All page number citations are to the typographical page numbers appearing internally on the top left corner or top right corner of the State Auditor's report. The citations are not to the number of the PDF page appearing in the PDF reader.

and procedures; however, it did not recommend any related actions." *Id*. pp. 36-37.  The State Auditor noted the minutes of the CIRB meetings did not always discuss policy changes[7].  *Id*. p. 37.  "We question why the review did not discuss the need for changes in some instances or discuss whether any changes made address the problems identified." *Id*.

Moreover, even though CIRB can initiate an internal affairs investigation if it votes that a policy violation may have occurred, the "Sheriff's Department has performed very few such investigations." *Id*. p. 38.  The Department only conducted four internal affairs investigations for the 30 cases the State Auditor reviewed, "even though we identified a number of potential violations or concerns in some of the other 26 cases that could justify further investigation." *Id*.  Of the 185 in-custody deaths that occurred from 2006 through 2020, **internal affairs informed the State Auditor that it investigated staff in only 21 of the 185 deaths**.  *Id*. p. 38.

The State Auditor further criticized the Sheriff's Department's decision to deem Critical Incident Review Board reports and investigations as "attorney-client privileged, meaning that they are confidential and cannot be disclosed without the Sheriff's Department's consent." *Id*. p. 37.  The report notes "[b]y keeping the findings and recommendations of the Critical Incident Review Board confidential, the Sheriff's Department risks conveying to the public that it is not taking these deaths seriously, investigating them thoroughly, or acting to prevent future incidents." *Id*.

The State Auditor concluded its critique of the Sheriff's Department's review of in-custody deaths as follows:

---

[7] It is unclear if the CIRB meeting minutes are the same as the CIRB reports, which the County claims are attorney-client privilege.  If the County has disclosed these items to the State Auditor, they cannot be legitimately protected by the attorney-client privilege.

> [T]he Sheriff's Department does not complete internal affairs investigations frequently enough for it to provide significant value. Although internal affairs indicates that its investigations are generally complaint-driven, the small number of investigations related to death cases—coupled with the lack of meaningful changes arising from the 30-day medical review and the Critical Incident Review Board meeting—calls into question the Sheriff's Department's commitment to protecting individuals in its custody.

*Id.*

### 4. Other external auditors criticize CIRB.

In June 2007, the Office of Independent Review ("OIR") conducted a use-of-force audit of the Sheriff's Department. *Use of Force Audit of San Diego County Sheriff's Department*, June 25, 2007, https://www.sdsheriff.net/documents/oir_full.pdf (last accessed August 20, 2020) [submitted at 2 Appx. 94]. The audit was prompted by three fatal shootings of unarmed Latino men in Vista by Sheriff's deputies, which occurred within a span of five days.

OIR's audit specifically reviewed the structure and function of CIRB. It expressed concern that CIRB was not rigorously reviewing the conduct of individual deputies in use-of-force cases to impose accountability, training, and supervision: "with the exception of isolated examples of accountability or training memoranda, there does not appear to be a sufficiently robust response to any information learned from the reviews of shootings." (2 Appx. 97). OIR noted "the focus of CIRB remediation has only been systemic, and no attention has been directed to individualized issues of performance on behalf of the involved deputies. *Id.* OIR wrote as follows:

> The CIRB process should force supervisors to make decisions about deputy performance . . . decision-makers should decide whether the actions of the deputies

- 13 -

> warranted targeted training, counseling, and/or briefing.
> In our view, issues of accountability, policy, supervision,
> equipment, and training not only need to be discussed, but
> also should result when appropriate in a concrete action
> plan. A coordinator assigned to CIRB should be
> responsible for ensuring that any action plan is
> implemented by the station command.

(2 Appx. 97-98).

     As an example of CIRB's failure to impose discipline or additional training or supervision on deputies who improperly use force, the OIR Report described CIRB's review of a shooting incident: "there was little articulated probable cause that formed the basis for the responding deputies to go into foot pursuit of a suspect that eventually resulted in a fatal shooting. While acknowledging this fact at the CIRB review, the Board did not pursue any remediation through Department-wide or individualized training, briefing, or further investigation." (2 Appx. 99). OIR discussed an incident during which a deputy struck an individual who was on top of the fence and then shot and killed the suspect at close range. (2 Appx. 100). "While a member of the CIRB panel questioned the tactics of the deputy who closed distance on a suspected armed suspect, rather than assisting with an already-initiated containment, no further Department-wide or individualized training, briefing, or disciplinary action was undertaken." (*Id.*).

     Of the 25 shooting cases that OIR reviewed, it noted that only one resulted in a formal Internal Affairs investigation for possible discipline of personnel. (*Id.*). That Internal Affairs investigation was not initiated by CIRB, but by a concerned supervisor. (*Id.*). "It is not surprising that the CIRB process led to no administrative investigations, given that it was not configured for such a result. Obviously, in the shooting cases, this meant there was little chance that discipline would occur as a consequence of potential policy violations, or that the Department would have a definitive record of its own concerns for future reference regarding the relevant officers." (2 Appx. 101). OIR concluded that CIRB should be

- 14 -

"reoriented" to impose additional training, briefing, and/or discipline on individual deputies. *Id.* OIR specifically recommended CIRB be revamped to "promote officer safety and sound policing practice by holding deputies accountable" and CIRB should order "individualized training and briefing of involved personnel[.]" (2 Appx. 103).

5. <u>Instead of keeping the function of CIRB a secret to preserve the attorney-client privilege, Sheriff Gore publicly touts CIRB as a means for improving the safety and care of inmates in the Sheriff's custody.</u>

In response to the State Auditor's report, Sheriff Gore issued a letter that he personally signed on behalf of the Sheriff's Department, which is included as part of the report. California State Auditor Report 2021-109 at p. 83, https://www.auditor.ca.gov/pdfs/reports/2021-109.pdf (last accessed March 25, 2022). In the Sheriff's Department's response, Gore wrote that CIRB compliments the "Department's goal of improving the health and welfare of incarcerated individuals entrusted in the care and custody of the Sheriff." *Id.* p. 103. When issues of concern are identified during an in-custody death, "the CIRB review is focused with an eye towards what changes have already been implemented by the chain of command to remedy any deficiencies before the matter made it to the CIRB for review, as well as any changes the chain of command may not have already identified and/or implemented to minimize the risk of recurrence." *Id.* If CIRB identifies changes that should be made, it is "empowered to make such recommendations." *Id.* With respect to in custody deaths, CIRB not only reviews the death, but also "considers the handling of the inmate from the time the inmate was originally booked. The Board looks to determine whether any warning signs existed, whether appropriate and timely safety checks occurred, and whether there were any risk reduction lessons that could be derived from the incident." *Id.* Gore defended CIRB as a tool of accountability and a means for improving inmate care: "While the focus of the CIRB may be risk management, the mechanism by which

risk management is ultimately accomplished is clearly through the promotion of best practices and policies that improve the health and welfare of incarcerated individuals and holding staff accountable." *Id*.

**C. The County of San Diego in This Case Fails to Reference and Identify CIRB-Related Documents and Material It Identified in the *Silva* Case.**

Plaintiff Frankie Greer has asked for three types of material related to CIRB: reports or memoranda generated for the 12 in-custody deaths that may have been reviewed by CIRB (RFP no. 52); a list of attendees to each CIRB review for the 12 in-custody deaths that identifies the attendee by name and job title (RFP no. 53); and copies of all materials provided to the Critical Incident Review Board regarding the 12 in-custody deaths (RFP. 54).  In response, the County identifies the following bates-numbered documents in its privilege log: CSD00594-00602; CSD00951-00995; CSD01606-01618;  CSD02509-02510;  CSD03427-03474;  CSD03963-03971;  CSD04523-04530;  CSD05044-05048;  CSD05868-05878;  CSD06840-06858; and CSD-08055-08057.  (1 Appx. 25-44).

Curiously, in the *Estate of Paul Silva* matter, the Sheriff's Department identified three types of CIRB-related records: (1) CIRB reports; (2) CIRB notification letters which appear to be a case synopsis sent to CIRB members; and (3) PowerPoint presentations that were shown during CIRB meetings. (2 Appx. 168-169).  But in this case, the Sheriff's Department only identifies the CIRB reports and is silent on the existence of other related documents, even though the CIRB notification letters and CIRB PowerPoint presentations are responsive to Plaintiff's RFP no. 54.

Additionally, the Sheriff's Department here is silent about the existence of attendance sheets or lists that would help establish who precisely constitutes the "client" that is purportedly being advised.  In the *Estate of Paul Silva* matter, the

- 16

Sheriff's Department made clear that a wide range of Sheriff's Department employees attend the CIRB meetings:

> Generally speaking, a CIRB meeting occurs in three stages. First, Department personnel present factual information regarding the underlying incident, including, in some instances, PowerPoints, to the CIRB members, including the Department's legal counsel. Department employees whose attendance was requested because of their relevant subject-matter expertise (e.g., weapons training unit, in-service training, K-9 unit, etc.) also attend. Next, the Department employees who present the factual information are dismissed from the room and CIRB members, including legal counsel, discuss and address issues with the Department's subject-matter experts. Lastly, the subject-matter experts are dismissed from the room and the CIRB members, including legal counsel, engage in further discussions. The DIS Lieutenant is also present to facilitate these communications and to document key issues, comments, and matters for inclusion in the CIRB confidential report.

(2 Appx. 168 at ¶ 8).  While Mr. Faigin avers that the CIRB process allows "key Sheriff's department personnel to consult with me as legal counsel," he makes no attempt to identify who precisely are the "key" personnel who are entitled to claim the attorney-client privilege.  (1 Appx. 46 at ¶ 6).  Mr. Faigin provides no explanation as to why an attendance sheet that simply lists the name and role of each attendee would constitute an attorney-client communication.

Moreover, the CIRB policy explicitly states that the employee who may have been the subject of the CIRB review will be "debrief[ed]" as to the "results of the CIRB" within seven days of the CIRB meeting.  (2 Appx. 80).  Mr. Faigin makes no attempt to explain how CIRB reviews are subject to the attorney-client privilege when the employee, who may be disciplined as a result of the CIRB review, is also told the results of that same CIRB review.  Instead, Mr. Faigin generally asserts that the details regarding CIRB discussions are not "conveyed to the deputies subject to

- 17

CIRB review" (1 Appx. 48 at ¶ 8). Yet, he also claims that he is the "primary architect of the CIRB policy and procedure" (1 Appx. 46 at ¶ 3) and the CIRB policy explicitly contravenes his claim.  In any event, the employee who is about to be disciplined cannot possibly claim to be the "client" for purposes of the attorney-client privilege as his interests, particularly if he is about to disciplined, are adverse to the interests of the Sheriff's Department.

## III. ARGUMENT

### A. By Failing to Make Any Particularized Showing Regarding Application of the Attorney-Client Privilege and Work-Product Privilege, the County Has Forfeited Its Claims.

Under the federal common law, unlike California state law, the burden is on the party asserting the attorney-client privilege to show that the privilege applies. *United States v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009).  Thus, in *Ruehle*, the Ninth Circuit reversed the district court which erroneously relied on California law to determine the attorney-client privilege applied, rather than applying the Ninth Circuit's established eight-part test.  *Id*.  The Ninth Circuit's eight-part test to determine whether information is covered by the attorney-client privilege examines: "(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived."  *Id*. at 607.

The Ninth Circuit in *Ruehle* held that defendant failed to satisfy his burden to show the attorney-client privilege applied.  *Id*. at 609.  "As the party asserting the privilege, Ruehle was obliged by federal law to establish the privileged nature of the communications and, if necessary, to segregate the privileged information from the non-privileged information."  *Id*.  But instead, Ruehle "made no effort to

identify with particularity which of his communications to the Irell attorneys are within his claim of privilege, in either his public or sealed filings before us. Under federal law, the attorney-client privilege is strictly construed. Ruehle's failure to define the scope of his claim of privilege weighs in favor of disclosure[.]" *Id*. Additionally, after carefully examining the record, the Ninth Circuit determined that Ruehle's claim of attorney-client privilege did not satisfy element four of the eight-part test – the communications to the attorneys were not made in confidence. *Id*.

Like in *Ruehle*, the County has failed to make any showing that the communications made to Mr. Faigin were made in confidence because a variety of Sheriff's Department personnel come in and out of the CIRB meetings. The County has refused to provide any information regarding the attendees and made no showing that communications have been made in confidence.

The Ninth Circuit and district courts in California have firmly rejected parties' use of blanket privilege claims. *Clarke v. American Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992) ("we have noted that blanket assertions of the privilege are 'extremely disfavored.' The privilege must ordinarily be raised as to each record sought to allow the court to rule with specificity."); *Miller v. Pancucci*, 141 F.R.D. 292, 302 (C.D. Cal. 1992) ("To properly claim attorney-client privilege, the claimant must specifically designate and describe the documents claimed to be within the scope of the privilege and to be reasonably precise in stating the reasons for preserving their confidentiality. Objections, in such boilerplate terms as those stated by Defendants, are improper and therefore 'no claim of privilege at all.'"). Absent information about particular documents claimed to be privileged, such as the date of the document, author, primary addressee, secondary addressee, type of document, client (*i.e.* party asserting privilege), subject matter of the document or privileged communication, and purpose of the document or privileged communication, a court reviewing the claims of attorney work product and attorney

1   client privilege lack the information they need to determine if any privilege applies.

2   *Miller*, 141 F.R.D. at 302.

3         By failing to make any particularized or fact-specific showing for the CIRB

4   reports and information requested related to the 12 previous in-custody deaths, the

5   County has failed to sustain its burden to demonstrate that each of the CIRB

6   reviews is subject to attorney-client privilege.  *United States v. Christensen*, 828

7   F.3d 763, 803 (9th Cir. 2015).  The County's attempt to claim that *all* CIRB

8   reviews and memoranda are protected by attorney-client privilege by providing a

9   generic declaration from Mr. Faigin fails under controlling Ninth Circuit authority.

10  "'The claim of privilege must be made and sustained on a question-by-question or

11  document-by-document basis; a **blanket claim of privilege is unacceptable**.  The

12  scope of the privilege should be 'strictly confined within the narrowest possible

13  limits.'"  *Christensen*, 828 F.3d at 803 (internal citation omitted)[8] (emphasis

14  added).  If the "'nonprivileged portions of a communication are distinct and

15  severable, and their disclosure would not effectively reveal the substance of

16  the privileged legal portions, the court must designate which portions of the

17  communication are protected and therefore may be excised or redacted (blocked

18  out) prior to disclosure.'"  *Id.*

19        But where a defendant fails to sustain its burden to show the existence of a

20  privilege by specifically designating or describing documents claimed to be

21  privileged, the court may order disclosure.  *See, e.g.*, *Miller*, 141 F.R.D. at 302;

22  *Myles v. Cty. of San Diego*, No. 15CV1985-BEN (BLM), 2016 WL 2343914, at *9

23  (S.D. Cal. May 4, 2016) ("agency fails to meet its burden if it uses boilerplate

24  language and makes 'no effort to tailor the explanation to the specific document

25  withheld'").

26        Although the County clamors about the threat to candid conversations during

27  CIRB, it makes no effort to show the privilege applies to each specific CIRB review

28

---

[8] Unless otherwise noted, all internal citations are omitted.

as required by the Ninth Circuit.  While invoking the work-product privilege in response to Plaintiff's RFP nos. 52, 53, and 54, both the County's privilege log and the declaration of Mr. Faigin are silent on this issue – there is no showing that the CIRB reports were generated in anticipation of litigation.  In fact, the Department's policy appears to mandate CIRB reviews occur whenever there is a death or serious injury on an individual in Sheriff's custody, regardless of the prospect of litigation. The death of Bruce Madsen Stucki was not even subjected to CIRB review (1 Appx. 19), even though the Citizens' Law Enforcement Review Board (CLERB) specifically referred the matter to the Sheriff's Department for review: "Medical decisions made and actions taken by medical personnel are not under CLERB's jurisdiction; the failure to initiate an alcohol withdrawal protocol and the delayed chest x-ray interpretation issues were referred to the San Diego Sheriff's Department (SDSD) for review."  (CLERB notice in this case at ECF no. 113-3). Here, for each of the CIRB reports related to in-custody deaths, the County has "not established that the Report was prepared in response to imminent litigation, rather than in the regular course of business[.]" *Myles*, 2016 WL 2343914, at *10.

Because the County is a sophisticated litigant who has failed to show that the privileges it invokes apply here, Plaintiff respectfully submits its invocation of privilege is waived.  *See*, *e.g.*, *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2005) (affirming district court's order finding privilege waived where sophisticated litigant produced privilege log five months after providing Rule 34 responses); *Ramirez v. Cty. of Los Angeles*, 231 F.R.D. 407, 410 (C.D. Cal. 2005) ("The party who withholds discovery materials must provide sufficient information (*i.e.,* a privilege log) to enable the other party to evaluate the applicability of the privilege or protection.  Failure to provide sufficient information may constitute a waiver of the privilege.").   Plaintiff propounded his Requests for Production (Set Four) on August 9, 2021.  *See* Joint Motion for Determination of Discovery Dispute regarding Plaintiff's Request for

Production (Set Four) Nos. 42-54, ECF no. 113, at 1.  The County only provided its privilege log (which does not even address all the invoked privileges) and the declaration of Mr. Faigin (which is similarly silent) on February 14, 2022 – six months later.

Moreover, fundamental fairness requires the County act diligently in demonstrating that the privileges it invokes apply in this case.  Mr. Faigin avers that "[d]isclosure of CIRB documents not only violates the attorney client privilege, but, even under the protection of a protective order, it would also threaten the following rights: official information privilege, law enforcement purposes protections, privacy privileges and confidentiality interests of personnel involved and interested third parties." (1 Appx. 48 at ¶ 9).  Yet, his assertion does not even make sense in the attorney-client context because if the interests of third parties and other personnel are implicated, then the communications cannot possibly be confidential or of an attorney-client nature.

Moreover, if other privileges are implicated, the County has an obligation to make a specific showing to enable Plaintiff to intelligently respond.  The County, in this case, provided written discovery responses certified by counsel, Ms. Carrie Mitchell, meaning that its invocation of privilege is:

> (i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law;
>
> (ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and
>
> (iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.

- 22

Fed. R. Civ. P. 26(g)(1)(B).  Yet, the County has made no specific factual showing regarding the invocation of the work-product privilege, deliberative process privilege, or official information privilege.  There is no declaration from any Sheriff's Department official regarding these privileges and their relation to the CIRB reports and CIRB material.  The County has not filed for a protective order under Fed. R. Civ. P. 26(c).  Instead, the County has impermissibly shifted to Plaintiff the burden of demonstrating that its invoked privileges apply.

Based on the foregoing, Plaintiff respectfully submits the County has forfeited its invocation of various privileges by failing to sustain its burden to demonstrate the invoked privileges apply to the CIRB material in this case.

**B.  The Attorney-Client Privilege and Work-Product Privilege Cannot Apply to CIRB Reports and Material Because They are Routinely Generated for Business Purposes.**

Because the attorney-client privilege "has the effect of withholding relevant information from the fact-finder, it applies only where necessary to achieve its purpose."  *Fisher v. United States*, 425 U.S. 391, 403 (1976).  Thus, the privilege "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege."  *Id*.  Communications made by an agency's employees to counsel, at the direction of agency superiors, to secure legal advice from counsel are protected by the attorney-client privilege.  *Upjohn Co. v. United States*, 449 U.S. 383, 394 (1981).

But lower courts have strictly enforced the requirements of *Upjohn* in determining whether the attorney-client privilege protects employee communications to counsel within an agency.  Questionnaires and material received from employees, that are ultimately passed along to in-house counsel, are not attorney-client communications when the employees do not receive any instruction that the requested information is needed to obtain legal advice from counsel.  *Lewis v. Wells Fargo & Co.*, 266 F.R.D. 433, 445–46 (N.D. Cal. 2010).

When a company does not tell employees that it is seeking information to enable the company to receive legal advice, and indicates that the information requested is part of a routine review, not an effort to obtain a legal opinion, the privilege does not apply. *Deel v. Bank of Am., N.A.*, 227 F.R.D. 456, 461-62 (W.D. Va. 2005). "The defendant's fatal flaw, however, was that it did not clarify to the employees completing the questionnaire that it needed the information to obtain legal advice. In *Upjohn,* the company's Chairman explained in a letter accompanying the questionnaire that he asked the company's general counsel to conduct an investigation to determine the nature and magnitude of possible illegal activities." *Id*. at 461.  The *Deel* court further noted that when Bank of America informed employees that business leaders, not lawyers, would be reviewing requested information, that suggested "the information would facilitate the Bank in making a business decision not obtaining legal advice."  *Id*. at 462.

Consulting counsel during an internal investigation to attempt to "cloak the investigation with privilege" does not render all communications made during that investigation privileged.  *United States v. ISS Marine Servs*., 905 F. Supp. 2d 121, 129 (D.D.C. 2012).  In *ISS Marine Services*, the company claimed an audit report that had been prepared by non-attorneys (like the CIRB reports here) then transmitted to non-attorneys (like CIRB commanders) and counsel (like the Sheriff's legal adviser) was protected by the attorney-client privilege because the report had been prepared for the purpose of obtaining legal advice.  *Id*. at 129. The company argued that the audit report was created and transmitted to obtain legal advice because it was sent to an outside firm, Arnold & Porter ("A & P"), with the stamp "Attorney-Client Privileged."  *Id*.  Attorneys at the firm Arnold & Porter "framed the issues, identified information to collect and outlined the legal framework for the investigation."  *Id*.

The district court rejected the company's contention. "At bottom, the respondent's claim to privilege appears to be premised on a gimmick: exclude

- 24 -

counsel from conducting the internal investigation but retain them in a watered-down capacity to 'consult' on the investigation in order to cloak the investigation with privilege." *Id*. at 129.  The attorney-client privilege only applies to communications between an agency's employees and counsel made at the direction of agency executives in order to secure legal advice.  *Upjohn*, 449 U.S. at 394 . For the results of an internal investigation to be entitled to the attorney-client privilege under *Upjohn*, "the company must clearly structure the investigation as one seeking legal advice and must ensure that attorneys themselves conduct or supervise the inquiries and, at the very least, the company must make clear to the communicating employees that the information they provide will be transmitted to attorneys for the purpose of obtaining legal advice." *ISS Marine Servs*., 905 F. Supp. 2d at 131.

Likewise, in this case, merely having an attorney present during the CIRB meeting and sending the attorney an investigative report cannot cloak the entire investigation in privilege.  "[A]rms-length coaching by counsel, as opposed to the direct involvement of an attorney, undercuts the purposes of the attorney-client privilege in the context of an internal investigation. Clearly, when an attorney is absent from the information-gathering process, 'the original communicator has no intention that the information be provided a lawyer for the purposes of legal representation.'" *Id*. at 130.  *See also SEC v. Microtune, Inc.*, 258 F.R.D. 310, 316 (N.D. Tex. 2009) (rejecting "categorical approach to attorney-client privilege" where company Microtune assumed all documents related to its internal investigation were privileged because they were made by or sent to outside counsel).

Finally, the attorney-client privilege does not attach to communications that would have been made in any event because of a business purpose.  *McCaugherty v. Siffermann*, 132 F.R.D. 234, 238 (N.D. Cal. 1990); *United States v. Chevron Texaco Corp.*, 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002)("The privilege does

- 25 -

not protect an attorney's business advice. Corporations may not conduct their business affairs in private simply by staffing a transaction with attorneys.").  As demonstrated by the Faigin article; the Sheriff's Department's own internal policy regarding CIRB reviews; the discussion regarding CIRB within the State Auditor's report; and the Sheriff's Department's description of CIRB as an "oversight" mechanism to the public, the primary purpose of CIRB is to determine whether a deputy acted properly and in accordance with policy and whether improvements in training or policy can be made to avoid future negative outcomes.  It is not to secure legal advice.

### C. Because CIRB reports are routinely generated, they are not made in anticipation of litigation.

District courts have rejected claims that internal investigations of potential officer misconduct are subject to protection under the work product doctrine.  *Kelly v. City of San Jose*, 114 F.R.D. 653, 659 (N.D. Cal. 1987).  In *Kelly*, the court held the work product doctrine could not protect internal investigations of possible officer misconduct, including internal administrative complaints regarding a police: "[s]ince police departments are under an affirmative *duty,* in the normal course of serving their public function, to generate the kind of information at issue here, the policies that inspire the work product doctrine are wholly inapplicable." *Id*. (emphasis in original).  In *Miller*, 141 F.R.D. at 303, the district court held that internal affairs investigations were not covered by the work product privilege because the police department's policy required such investigations to be completed in the regular course of business.  The Sheriff's Department's CIRB policy shows that these reports would be routinely created even without litigation.

### IV. CONCLUSION

Based on the foregoing, Plaintiff respectfully this Court compel the production of information and material related to the Sheriff's Department Critical Incident Review Board.

1

2   Dated March 25, 2022

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,

**IREDALE AND YOO, APC**

s/ Grace Jun

GRACE JUN
Attorneys for Plaintiff FRANKIE GREER

- 27