UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Greer, | Case No.:  19cv378-JO-DEB |
| Plaintiff, | **ORDER DENYING DEFENDANTS COUNTY OF SAN DIEGO, WILLIAM GORE, ALFRED JOSHUA, AND BARBARA LEE'S MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| County of San Diego et al., | |
| Defendants. | |

While detained in San Diego Central Jail, Plaintiff Frankie Greer had a seizure, fell from a top bunk bed, and suffered grave injuries.  Plaintiff filed a complaint against the four jail employees who failed to provide him with seizure medication, a lower bunk bed, and emergency medical aid ("Officer Defendants").  He also sued high level jail officials ("Supervisory Defendants") and the County of San Diego ("County") alleging various claims for (1) violation of 42 U.S.C. § 1983; (2) negligence; (3) Americans with Disabilities Act (ADA) violation; (4) Rehabilitation Act violation; and (5) Tom Bane Civil Rights Act (Bane Act) violation.  On September 19, 2022, Supervisory Defendants and the County filed motions for summary judgment on these claims.  Dkts. 208, 211.  The Court

held oral argument on February 8, 2023.  For the reasons discussed below, the Court denies these motions.

## I. BACKGROUND

**A. Plaintiff's Injury**

During his arrest intake procedure, Plaintiff communicated to the medical staff that he had a seizure disorder and required anti-seizure medication.  On January 31, 2018, Plaintiff was arrested and booked into San Diego Central Jail at approximately 5:37 pm. Dkt. 218-4 (Vol. 1 Plaintiff's Appendix ("1 Pl. App.")) at 00043.  During the booking process, Plaintiff informed the medical staff that he suffered from a seizure disorder and required medication twice daily to prevent seizures.  1 Pl. App. 00044, 00049, 00060. Plaintiff further informed the medical staff that he did not have his second dose that day. 1 Pl. App. 00060.  Defendant Macy Germono, a jail nurse, conducted the medical evaluation of Plaintiff that evening at approximately 8:55 pm and notated Plaintiff's seizure disorder in the Jail Information Management System ("JIMS"), the system used by the jail to communicate an inmate's information.  1 Pl. App. 00049.  Nurse Germono wrote Plaintiff's diagnosis as "Epilepsy" and notated his prescription requirement in the file.  1 Pl. App. 00061, 00063, 00064.  She also notated in JIMS, pursuant to the County's policies, that Plaintiff needed a lower bunk assignment.  1 Pl. App. 00063; Dkt. 245-3 (Vol. 3 Plaintiff's Appendix ("3 Pl. App.")) at 00213, 00217.

Despite learning of Plaintiff's medical condition during the screening process, Nurse Germono failed to provide Plaintiff with his anti-seizure medication.  The County's standard nursing protocols and the nursing standard of care required Nurse Germono to call the on-call doctor to obtain the anti-seizure medication for him that night.  3 Pl. 00213, 00374.  She failed to do so.  Dkt. 209-5 (Germono Decl.) at ¶ 12.  Nurse Germono testified that she did not know that County policies required her to call the on-call doctor that night to obtain the anti-seizure medication.  3 Pl. App. 00219, 00220.  Nor did she recall receiving any training about needing to do so.  *See* 3 Pl. App. 00220.  Instead, she placed a note in Plaintiff's file to be seen by a doctor the following day.  Germono Decl. ¶¶ 8, 12.

Plaintiff thus missed his required dose of medication his first day in custody because Nurse Germono did not take the proper steps to provide Plaintiff with his anti-seizure medication. *See* Germono Decl. ¶ 12.

Despite Nurse Germono's medical screening notes, Plaintiff still did not receive his seizure medication the next day.  The jail doctor did not examine Plaintiff or provide him with his medication during his second day in custody.  Dkt. 59 at ¶¶ 43–44; Germono Decl. ¶ 14.  No other jail staff took steps to ensure that Plaintiff received his prescription seizure medication.  *See* Germono Decl. ¶ 14.  Plaintiff thus missed his doses of seizure medication for the second day.  *Id.*

Nor did Plaintiff receive a lower bunk designation.  Defendant Francisco Bravo, the jail deputy in charge of assigning beds to inmates, was required to house inmates appropriately based on their medical instructions in JIMS.  Dkt. 218-5 (Vol. 2 Plaintiff's Appendix ("2 Pl. App.")) at 00082.  The jail's policy required the deputies to review the medical instructions in JIMS to designate the appropriate housing.  Dkt. 206-4 (Bravo Decl.) ¶ 6; Dkt. 211-5 (Buchanan Decl.) ¶ 8, Ex. F.  Despite this requirement that he review the medical instructions and any bunk notation in JIMS, Deputy Bravo did not assign Plaintiff to a lower bunk in the cell.  *See* 2 Pl. App. 00082, 00093; 3 Pl. App 00253-00254. He was also responsible for making a lower bunk notation on Plaintiff's face card, a physical index card that lets the housing staff know medical restrictions.  Buchanan Decl. ¶ 8, Ex. F; 2 Pl. App. 00199-200.  He did not make a lower bunk notation on Plaintiff's face card.  2 Pl. App. 00087, 00182.  Defendant Christopher Simms, the housing deputy who physically escorted Plaintiff to his cell, also failed to assign Plaintiff to a lower bunk. 2 Pl. App. 00086.  According to the policy, he was to place an inmate with a lower bunk medical instruction in a cell that has a lower bunk available.  Dkt. 210-10 (Simms Decl.) ¶ 7, Ex. F.  Plaintiff told him that he suffered from seizures and should not be assigned a top bunk.  *See* 3 Pl. App. 00283.  Despite knowing that Plaintiff should not be assigned to a top bunk due to his seizure disorder, Deputy Simms assigned Plaintiff to a top bunk around 1:44 pm that afternoon.  2 Pl. App. 00086.

That evening, after two days of missing his doses of anti-seizure medication, Plaintiff suffered a medical emergency.  Around 6:15 pm, while in the top bunk, Plaintiff suffered a seizure and fell at least six feet onto the concrete cell floor, rendering him unconscious.  3 Pl. App. 00296-297, 308; Pl. Video Ex. 1.  The County's expert opined that Plaintiff's fall from the top bunk was more likely than not caused by a seizure.  3 Pl. App. 00335.   He further testified that Plaintiff's failure to receive his anti-seizure medication contributed to his seizure.  3 Pl. App. 00335.   Plaintiff's two cellmates immediately shouted for help and pushed the emergency intercom button, which connects inmates to security control for emergency assistance.  3 Pl. App. 00293-294, 00312, 00319.  Soon, inmates in other cells also started shouting for help.  3 Pl. App. 00306, 00313.  Defendant Michael Campos, the control deputy in the control tower responsible for responding to the intercom calls, did not respond to the emergency intercom calls or the repeated inmate shouts for help.  *See* 3 Pl. App. 00264, 00306.  The jail's policy required control deputies to maintain the intercom system for the purpose of providing a means of relaying and summoning emergency assistance.  Buchanan Decl., ¶ 9, Ex. H.  Even though the intercom system was functional, Plaintiff did not receive an emergency medical response to the intercom calls.  Dkt. 207-6 (Campos Decl.) at ¶¶ 7–9; 3 Pl. App. 00264, 00271, 00306.  Around 7:00 pm, approximately forty-five minutes after Plaintiff's fall and the cellmates' calls for help, other floor deputies conducting their routine cell checks found Plaintiff on the floor unconscious and bleeding from his head.  3 Pl. App. 00307; Pl. Video Ex. 1.

**B. County Jail Supervisors**

At the time of Plaintiff's incident, Supervisory Defendants William Gore, Alfred Joshua, and Barbara Lee bore responsibility for overseeing and supervising staff in the County jails.  Sheriff Gore, the elected Sheriff of the County of San Diego, was responsible for the hiring, training, supervision, discipline, and control of all San Diego County Sheriff's Department custodial employees and medical staff.  Dkt. 211-8 (Gore Decl.) ¶¶ 1, 2, 5.  He was also involved in the Sheriff's Department's policymaking.  Gore Decl. ¶

4

10.   Based on his role as Sheriff, Defendant Gore was a named defendant and personally served in many of the lawsuits against the County arising from in-custody inmate injuries and deaths.  *See, e.g.*, *Thomas v. County of San Diego*, 15cv2232-L-AGS (S.D. Cal. 2015). Dr. Joshua, the Chief Medical Officer for the San Diego County Sheriff's Medical Services Division, was responsible for supervising the medical staff and overseeing quality assurance for all medical and psychiatric doctors in the County jails.  Dkt. 211-9 (Joshua Decl.) ¶¶ 2, 3.   Ms. Lee, the Medical Services Administrator for the San Diego County Sheriff's Department, was in charge of supervising the medical and nursing staff and implementing the medical policies and procedures of the San Diego County jails.  Dkt. 211-10 (Lee Decl.) ¶¶ 1, 2.

In the course of performing their supervisory duties[1], these high-level jail officials attended the meetings of the San Diego County Sheriff's Department Critical Incident Review Board (CIRB).  The CIRB is an internal County oversight board that conducts mandatory reviews of in-custody deaths and critical incidents in the County jails.  *See* Dkt. 226; Dkt. 307-2 (Vol. 4 Plaintiff's Appendix ("4 Pl. App.)) at 462.  The CIRB investigates these incidents to determine the training issues and policy violations underlying these incidents and analyze whether changes need to be made.  Dkt. 226 at 3–4.  Following these meetings, it must write and issue reports with specific findings from the meeting and discussions.  *Id.*  Sheriff Gore's position as County Sheriff required him to sign off on these CIRB reports regarding these critical incidents and in-custody inmate deaths.  *See* 4 Pl. App. 466, 476, 523, 585, 608.  Ms. Lee, as a supervisor of medical and nursing staff, personally attended the CIRB meetings and reviewed the recommendations and policy changes during the meetings.  *See* 4 Pl. App. 478, 526, 586, 610, 622 627.  Dr. Joshua, as

---

[1] Sheriff Gore was the elected Sheriff of the County of San Diego from July 3, 2009, to February 3, 2022. Gore Decl. ¶ 1.  Dr. Joshua served as Chief Medical Officer for the San Diego County Sheriff's Medical Services Division from November 2013 through June 2018.  Joshua Decl. ¶ 3.  Ms. Lee served as the Medical Services Administrator for the San Diego County Sheriff's Department from 2012 until January 2020.  Lee Decl. ¶ 1.

the head of all the psychiatric and medical staff, also personally participated in these meetings and provided medical information regarding the in-custody deaths. *See* 4 Pl. App. 519, 525, 569, 583, 586, 590, 594, 615.

In these roles, Supervisory Defendants became personally aware of numerous inmate deaths resulting from jail personnel failures to (1) follow up to address serious medical needs identified during medical screenings and (2) effectively communicate those medical needs between jail divisions to provide adequate care.[2]   In 2012, Bernard Victorianne died in his cell as a result of medical staff failures to follow up to provide required medical care despite his clear medical distress, and to communicate his serious medical condition to other jail staff.  4 Pl. App. 472.  Medical staff identified overdose symptoms and erratic behavior from Mr. Victorianne's medical screening but did not ensure he received immediate treatment.  4 Pl. App. 473.  Instead, jail staff sent him to his cell where he did not receive medical attention for seven days, until he died in his cell from this lack of critical treatment.  4 Pl. App. 474.

In 2014, Kristopher Nesmith died from suicide in his cell after medical staff failed to provide follow up treatment on his psychiatric condition or communicate to detention staff the medical need to monitor him.  Medical staff screened Mr. Nesmith and knew he was not taking his psychiatric medication, yet they failed to follow up to ensure he received psychiatric care.  4 Pl. App. 519.  They also failed to inform the detention staff about Mr. Nesmith's poor psychiatric condition and communicate a need for monitoring, despite their knowledge of this need from the screening.  4 Pl. App. 519.  Mr. Nesmith did not receive medical care for his psychiatric needs, and unmonitored, committed suicide in his cell.  4 Pl. App. 517.  During the CIRB investigation into Mr. Nesmith's death, the CIRB meeting attendees discussed the need to improve communication between medical staff and detention staff regarding inmates who needed to be monitored in order to prevent their

---

[2]  The San Diego County Sheriff's Department Critical Incident Review Board (CIRB) records documented these instances of inmate deaths.

deaths.  4 Pl. App. 521.  They determined that the "big picture where our biggest risks are…boils down to communication…between the psychiatric staff [and] the deputies."  4 Pl. App. 521.  They also examined how the medical staff's failure to follow up to give Mr. Nesmith the proper medications factored into his death.  4 Pl. App. 522.

The death of Jerry Cochran in 2014 also revealed problems with medical staff failures to follow up with medical needs identified in medical screenings.  An intake nurse screened Mr. Cochran and saw he was unsteady and could not stand upright, but failed to take the proper steps to investigate his condition or provide him the medical treatment he needed.  4 Pl. App. 549, 572, 568.  Despite signs of being seriously ill, the nurse did not take his vitals, did not ask if he was diabetic, and merely noted that Mr. Cochran was "alert and oriented" in his jail medical records.  4 Pl. App. 546-47.  The failure to properly communicate his medical needs resulted in Mr. Cochran being sent into the cell area, where he collapsed and died shortly after from diabetic ketoacidosis at the hospital from lack of proper medical treatment.  4 Pl. App. 549.

These inmate deaths arising from jail staff failures to communicate and follow up with necessary medical treatment continued in the subsequent years.  In 2015, Jason Nishimoto died by suicide in his cell after nursing staff failed to communicate the need to provide him with an "enhanced observation" housing assignment.  4 Pl. App. 590.  During a medical screening, nursing staff obtained knowledge of Mr. Nishimoto's suicidal history but did not take any further action to assess him for an  appropriate housing assignment.  4 Pl. App. 590.  The CIRB attendees at the meeting for Mr. Nishimoto's death discussed the failure of the nurse to take the steps to place Mr. Nishimoto in the appropriate housing based on his medical condition.  *See* 4 Pl. App. 591.

That same year, Ruben Nunez died after medical staff failed to communicate a "water alert" to the jail housing staff.  4 Pl. App. 582.  Mr. Nunez had a water alert in his file concerning his medical condition that caused him to drink fatal amounts of water.  4 Pl. App. 581.  Medical staff, however, failed to communicate to housing staff the medical need to restrict his access to water.  4 Pl. App. 583.  As a result, housing staff placed him

near a water source and Mr. Nunez, left unchecked, died from drinking a significant amount of water in his cell causing his death.  4 Pl. App. 581.

In 2016, shortly after Mr. Nunez's death, Heron Moriarty died by suicide in his cell after medical staff failed to place him in a safety cell or "enhanced observation" housing, even though they knew he was psychotic and off his regular bipolar medication.  4 Pl. 00615.  During his assessment, Mr. Moriarty made statements that he was suicidal to the medical staff.  4 Pl. App. 00615.  His wife also called the jail with concerns of his mental health.  4 Pl. App. 00615.  Despite the medical screening and these warnings about Mr. Moriarty's mental health, jail staff failed to place him in the appropriate housing for his medical needs.  4 Pl. App. 615.  The CIRB attendees at the meeting on Mr. Moriarty's death discussed the series of clinician errors in failing to give Mr. Moriarty the proper monitoring.  4 Pl. App. 616.

These repeated failures of medical follow up and effective communication to ensure inmates' serious medical needs also extended to the County's emergency response systems.  In 2016, Richard Boulanger committed suicide in his cell.  4 Pl. App. 00596.  An investigation into Richard Boulanger's death revealed concerns about deputy failures to make sure the intercom system was operational and not muted in order to provide the proper emergency medical response.  4 Pl. App. 00598.  At the time of Mr. Boulanger's death, the deputies on duty claimed to not receive intercom calls although the system was functional.  4 Pl. App. 00598.  Prior to Mr. Boulanger's incident, another incident occurred in 2016 where the intercom was reportedly at a low volume and ineffective.  *See* 4 Pl. App. 00599.

Thus, in a six-year span from 2011 to 2017, Sheriff Gore, Dr. Joshua, and Ms. Lee became aware of at least eleven individuals who died in their custody due to failures of jail staff to communicate between departments about serious medical needs or to provide the adequate follow up treatment to meet those needs.  In addition to those incidents described above, CIRB also investigated the deaths of Daniel Sisson (died in 2011 from asthma and withdrawals where cell checks did not timely identify medical needs); Ronnie Sandoval

(died in 2014 from failure to get medical treatment to prevent overdose); and Adrian Sanchez (died in 2016 after he was placed in holding cell despite a medical screening flagging his seizures and drug overdose).

Moreover, these high-level County officials were likely aware that a grand jury had investigated the effectiveness of JIMS, the jail's communications system for relaying inmates' medical instructions between the medical staff and the custodial staff.  In 2016, a San Diego County Grand Jury investigation into the County jails reported that the JIMS database had usage issues and jail staff reported having trouble "sorting and retrieving information from the database." *See* https://www.sandiegocounty.gov/content/sdc/grandjury/report15_16.html.

## C. Procedural History

On February 17, 2021, Plaintiff filed a Second Amended Complaint alleging (1) deliberate indifference, negligence, and Bane Act violations against Officer Defendants; (2) deliberate indifference, failure to train, supervise, and discipline, and Bane Act violations against Supervisory Defendants; and (3) *Monell* municipal liability, ADA and Rehabilitation Act violations, and Bane Act violation against the County.  Dkt. 59 (SAC). Plaintiff premised his *Monell* claims against the County and his deliberate indifference claims against Supervisory Defendants on a failure to train, supervise, and discipline Officer Defendants despite a well-known history of systemic failures to communicate critical medical information and coordinate the follow-up care of seriously ill inmates.

On September 19, 2022, Officer Defendants, Supervisory Defendants, and the County filed motions for summary judgment.  On December 9, 2022, the Court denied Officer Defendants' motions for summary judgment, finding triable issues of fact on the deliberate indifference, negligence, and Bane Act claims.  For the reasons discussed below, the Court denies the County and Supervisory Defendants' motions.  Dkts. 208, 211.

## II. LEGAL STANDARD

A court may grant summary judgment only where the evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247 (1986). An issue of fact is "genuine" if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson*, 477 U.S. at 248–49. A fact is "material" if it may affect the outcome of the case. *Id.* at 248. The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to establish specific facts demonstrating the existence of genuine issues for trial. *In re Oracle Corp. Sec. Litig.,* 627 F.3d 376, 387 (9th Cir. 2010). The non-moving party must present evidence from which a reasonable jury could reach a verdict for the non-moving party. *Id.* The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014).

### III. DISCUSSION

**A. Defendants' Evidentiary Objections**

Prior to reaching the substantive arguments, the Court first addresses Defendants' evidentiary objections to the evidence that Plaintiff offers in opposition to the motions for summary judgment. Defendants object to (1) the San Diego County Sheriff's Department CIRB records; (2) the allegations from the *Thomas v. County of San Diego* complaint; (3) the declaration of Sgt. Joseph Navarro; (4) excerpts from Ben Samonte's deposition; (5) excerpts from the National Commission on Correctional Health Care Technical Assistance Report; (6) an investigation report from the *Estate of Silva v. County of San Diego* litigation; (7) excerpts from a Citizens' Law Enforcement Review Board meeting; and (8) the San Diego County Grand Jury Report of 2016. Defendants object to all of the above evidence on the following grounds: (1) hearsay; (2) "unduly time consuming, prejudicial, confusing, or misleading"; (3) insufficient foundation based on personal knowledge and

authenticity, and (4) "inadmissible speculation and conclusions."[3]  Because the Court only relies on the CIRB records and the San Diego County Grand Jury Report to reach its conclusion, it will only rule on objections to those documents.  Moreover, the Court will address only the foundation and hearsay objections.   The remaining objections are superfluous because the summary judgment standard already dictates that the Court only consider material evidence.  Fed. R. Civ. P. 56 (a court can award summary judgment only when there is no genuine dispute as to any material fact).

### 1. Authenticity Objections

Defendants generally assert that the above evidence is inadmissible because Plaintiff submitted the documents without providing any supporting evidence to show their authenticity.  Although Defendants challenge the exhibits on grounds of this technical failure, they do not express concerns that these documents are not what they purport to be.

A court can only consider admissible evidence in ruling on a motion for summary judgment.  *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e)).  Because authentication is a precondition to admissibility, evidence must therefore be properly authenticated for use in a motion for summary judgment.  *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550–51 (9th Cir. 1990).  This authentication requirement is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Fed. R. Evid. 901(a); *U.S. v. Tank*, 200 F.3d 627, 630 (9th Cir. 2000).  The Ninth Circuit has found documents to be authenticated when they were in the opposing party's possession.  *U.S. v. Black*, 767 F.2d 1334, 1342 (9th Cir. 1985).

Furthermore, Federal Rule of Evidence 902 provides for self-authentication of publications issued by a public authority.  Fed. R. Evid. 902(5).  Federal courts routinely consider official records from government websites to be self-authenticating.  *See, e.g.*,

---

[3] Defendants also raised privilege objections to the San Diego County Sheriff's Department CIRB records but the Court has already overruled them.

*Estate of Gonzales v. Hickman*, No. 05-660, 2007 WL 3237727, at *2, fn.3 (C.D. Cal. May 30, 2007); *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 551 (D. Md. 2007) ("Given the frequency with which official publications from government agencies are relevant to litigation and the increasing tendency for such agencies to have their own websites, Rule 902(5) provides a very useful method of authenticating these publications.   When combined with the public records exception to the hearsay rule, Rule 803(8), these official publications posted on government agency websites should be admitted into evidence easily.").

Despite Plaintiff's failure to attach an affidavit of personal knowledge verifying the San Diego County Sheriff's Department CIRB records and the Grand Jury Report of 2016, the Court finds that the authenticity of these documents is not in question.   With regard to the CIRB records, Defendants were the party in possession of these records and produced them to Plaintiff.   Because this evidence was in the opposing party's possession, the Court finds that this is sufficient evidence for a reasonable jury to conclude that the documents are authentic.   *Black*, 767 F.2d at 1342; *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 972–73 (C.D. Cal. 2006) (holding that production of documents by defendant in discovery was sufficient circumstantial evidence for a reasonable jury to find the documents authentic despite defendant's allegation that plaintiff had not properly authenticated the documents).

With regard to the San Diego County 2016 Grand Jury Report, the Court finds that this report is a self-authenticating public record filed at the San Diego County website.   The San Diego County Grand Jury is a body of citizens who are charged and sworn to investigate the operations of governmental programs of the County.   *See* https://www.sandiegocounty.gov/content/sdc/grandjury.html.   The Grand Jury issues these public reports on the San Diego County website.   Because the 2016 Grand Jury Report is available to the public at the County government website, the Court finds that this report is an official publication pursuant to Federal Rule of Evidence 902(5).   The Court therefore overrules Defendants' objections on authentication grounds.

Defendants also broadly challenge these same exhibits for lack of foundation based on personal knowledge.  Personal knowledge is not required to establish a proper foundation if other methods of authentication are available.  *Orr*, 285 F.3d at 773–74; Fed. R. Evid. 901(b) (providing methods of authentication); Fed. R. Evid. 902 (self-authenticating documents need no extrinsic foundation).  Moreover, even if the non-moving party's evidence is presented in a form that is currently inadmissible, such evidence may be evaluated on a motion for summary judgment so long as the objections could be cured at trial.  *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).  The Court finds that other methods of authentication are available, as explained above, and denies this objection as moot.

### 2. Hearsay Objections

The Court also overrules Defendants' hearsay objections to the above two categories of documents.  Hearsay, out-of-court statements "offered in evidence to prove the truth of the matter asserted," are generally not admissible unless it falls under an exception set forth in the Federal Rules of Evidence.  Fed. R. Evid. 801(c).  One of these exceptions includes business records kept in the course of regularly conducted activity.  Fed. R. Evid. 803(6).  Under this business records exception, a record of "an act, event, condition, opinion, or diagnosis" is admissible if the record was made at or near the time by someone with knowledge, the record was kept in the course of a regularly conducted activity of a business, and making the record was a regular practice of that activity.  *Id.*  Another hearsay exception applies to "record[s] or statement[s] of a public office" that includes "factual findings from a legally authorized investigation" so long as "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8); *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988) ("As long as [an opinion or] conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement, it should be admissible . . . .").  Documents under this public record exception "are presumed trustworthy, placing the burden of establishing untrustworthiness on the opponent of the evidence."  *U.S. v. Loyola-Dominguez*, 125 F.3d

1315, 1318 (9th Cir. 1997); *Johnson v. City of Pleasanton*, 982 F.2d 350, 352 (9th Cir. 1992) ("[T]he burden of establishing a basis for exclusion falls on the opponent of the evidence.").

The Court finds that the CIRB records satisfy the public records and business records exceptions to hearsay. The Sheriff's Department mandates the CIRB to formally review all critical incidents that occur in its County jails as an internal oversight board. Dkt. 226 at 4–5. In carrying out its legally authorized duties, the CIRB makes factual findings documented in these reports. *Id.* Because these reports are factual findings from a public legally authorized investigation, the burden is therefore on Defendants to challenge the CIRB reports' trustworthiness. Defendants have not raised any argument to support any of their objections, including this one. Additionally, the CIRB members must prepare and issue these reports containing the specific findings of each critical incident. Dkt. 226 at 4. Because these mandatory CIRB meetings occurred regularly, the CIRB reports were prepared by someone at the meeting during or shortly after the critical incident in question, and CIRB issues these reports as part of their regular practice, the Court finds that these CIRB records meet the business record hearsay exception pursuant to Federal Rule of Evidence 803(6). Accordingly, the Court overrules the hearsay objection as to the CIRB records.

The Court similarly finds that the San Diego County 2016 Grand Jury Report is admissible under the public records hearsay exception. As explained above, the San Diego County Grand Jury is charged to formally investigate County departments and programs. The 2016 Grand Jury Report details the factual findings from these legally authorized investigation into the County's jails. *Montiel v. City of Los Angeles*, 2 F.3d 335, 341 (9th Cir. 1993) (holding that the district court should have presumed the Report of the Independent Commission on the Los Angeles Police Department was trustworthy). Defendants have not raised a challenge to the Grand Jury Report's trustworthiness. Accordingly, the Court overrules the hearsay objection to this 2016 Grand Jury Report.

The Court denies as moot the objections to the remaining evidence because it does not rely on that evidence in ruling on this motion.

**B. Section 1983 Claims**

The Court now turns to whether Plaintiff has raised a triable issue of fact for the jury with regard to his Section 1983 claims against the County and Supervisory Defendants. The County argues that Plaintiff's *Monell* failure to train claim fails because Plaintiff has not shown the County was on notice of a need to train its staff to provide adequate medical care and communicate medical needs. Similarly, Supervisory Defendants argue that the supervisory claims for failure to train fail because Plaintiff has not shown they were on notice of their subordinates' failures to provide this medical care. Supervisory Defendants further argue that they are entitled to qualified immunity on these claims because clearly established law did not put them on notice that their conduct was unlawful. The Court will examine each of these arguments in turn.

*1. Monell Claim*

Plaintiff brought a *Monell* claim against the County alleging a (1) *de facto* policy of permitting constitutional failures to provide adequate medical care and communicate medical needs (Dkt. 305 at 16); and (2) failing to train, supervise, or discipline despite knowledge of these constitutional failures (Dkt. 305 at 19–22).[4] Because these theories are both premised on the County's alleged practice of failing to take action to prevent violations, the Court construes these theories as a claim for failure to train and/or supervise.

The County argues that Plaintiff does not point to any evidence of similar past constitutional violations that put the County on notice that it needed to better train and/or supervise its employees. A county is liable under Section 1983 if it maintains a "policy or

---

[4] Plaintiff also argues that the County maintains an unconstitutional *de facto* policy of racially segregating detainees. Dkt. 305 at 22. Plaintiff has not pointed to any evidence in the record that establishes that this *de facto* policy was the cause of his denial of seizure medication or his lower bunk, as required to prove a *Monell* claim. *See Castro v. County of Los Angeles*, 833 F.3d 1060, 1075 (9th Cir. 2016). The Court therefore finds Plaintiff fails to raise a triable issue as to this theory.

custom" deliberately indifferent to a plaintiff's constitutional rights that caused his constitutional injury. *Monell v. Department of Social Services*, 436 U.S. 658, 690–91 (1978).  For the purposes of *Monell* liability, a policy can be a written policy, an unwritten policy in the form of pervasive customs and practices, or a failure to train, supervise, or discipline municipal employees on avoiding constitutional violations.  *See Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–603 (9th Cir. 2019).  To prove a county's failure to train, a plaintiff must show the county was deliberately indifferent to the need for better training despite its knowledge of past employee misconduct.  *Castro v. County of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016).  A plaintiff can show these omissions and failures to train if "facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens." *Id.*  Such a county's failure to train, supervise, or discipline its employees is a conscious "failure to implement procedural safeguards to prevent constitutional violations." *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014).  A plaintiff can establish a failure to train an employee by demonstrating that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

In this case, Plaintiff has raised a triable issue that the County failed to train and/or supervise medical staff to properly communicate critical medical needs identified during an inmate's medical screening and to follow up to ensure those critical needs are being provided to inmates.  During his intake medical screening, Plaintiff communicated to Nurse Germono that he had a seizure disorder and required twice daily anti-seizure prescription medication.  1 Pl. App. 00061, 00063.  Nurse Germono did not know that the County's policies required her to immediately contact an on-call doctor to obtain the prescription medication for Plaintiff.  3 Pl. 00213, 00219, 00374.  Nor did she receive training on these policies requiring her to do so.  *See* 3 Pl. App. 00220.  Nurse Germono thus did not follow

the County's policies requiring her to provide Plaintiff with his medication following his medical screening. Germono Decl. at ¶¶ 8, 12. The next day, Plaintiff still did not receive his seizure medication because the jail doctor failed to examine Plaintiff or provide him with his medication. Dkt. 59 at ¶¶ 43–44; Germono Decl. ¶ 14. No medical staff ensured that Plaintiff had received his prescription seizure medication. *See* Germono Decl. ¶ 14.

The County's policies and procedures also required the housing deputies to review the medical staff notations in JIMS to assign the appropriate bunk on the inmate's face card. Buchanan Decl. ¶ 8, Ex. F. Despite Nurse Germono's lower bunk designation in JIMS, Deputy Bravo did not follow through on the medical instructions in JIMS to designate Plaintiff to a lower bunk. Bravo Decl. ¶¶ 4, 7. The failure to communicate between the medical staff and the custodial staff regarding Plaintiff's medical need for a lower bunk, identified during his medical screening for his safety, resulted in the denial of a lower bunk. *See* 2 Pl. App. 00082, 00086, 00093; 3 Pl. App 00253-00254.

The County's policies further required the control deputy in the control tower to ensure the intercom system was working in order to provide emergency assistance. Buchanan Decl. ¶ 9, Ex. H. Despite these policies, Deputy Campos failed to respond to the emergency intercom call. *See* 3 Pl. App. 00264, 00306.

The Court finds that Plaintiff has presented sufficient evidence to show causation between his injuries and the County's failure to train, supervise, or discipline to ensure that medical staff follow up on and communicate serious medical needs identified during a medical screening. To determine *Monell* liability, the Court must examine whether there is a "direct causal link" between the county's failure to train and the plaintiff's alleged constitutional deprivation. *Castro*, 833 F.3d at 1075 (citing *City of Canton*, 489 U.S. at 385). A plaintiff's burden is to establish "that the injury would have been avoided had proper policies been implemented." *Long v. County of Los Angeles*, 442 F.3d 1178, 1190 (9th Cir. 2006) (internal quotations omitted). As explained above, the County's policies require a nurse to call an on-call doctor that evening to obtain Plaintiff's anti-seizure medication. 3 Pl. 00213, 00374. Nurse Germono testified that she did not know that she

was supposed to call an on-call doctor immediately to obtain that medication.  3 Pl. App. 00219.  Nor did she receive training on the policy requiring her to do so.  *See* 3 Pl. App. 00220.  Nurse Germono thus did not call the on-call doctor that evening to obtain Plaintiff's anti-seizure medication, and Plaintiff did not receive his required medication as a result.  Germono Decl. ¶ 12.  Plaintiff consequently suffered a seizure, which, according to the County's expert, caused him to fall from the top bunk.  3 Pl. App. 00335.  Based on the above, a reasonable jury could infer that had medical staff been adequately trained on the County's policies requiring them to timely follow up on serious medical needs identified during screenings—in this case, by calling the on-call doctor to provide the required anti-seizure—Plaintiff would have received his medication that night.  Plaintiff also missed his dose his second day in custody because the doctor did not see him and no medical staff followed up to ensure that he received his medication.  *See* Germono Decl. ¶ 14.  A reasonable jury could also infer that adequate training and supervision would have prevented this failure.  In sum, Plaintiff has created a triable issue that he fell and suffered injury because of a seizure and that the occurrence could have been avoided if the County had appropriately trained medical staff to follow up with his medication needs.

Plaintiff has also presented sufficient evidence to show causation between his injuries and the County's failure to train and/or supervise to communicate serious medical needs between jail divisions.  Despite the policy requiring custodial staff to follow JIMS medical instructions to assign inmates housing based on their medical needs, *see* Buchanan Decl. ¶ 8, Ex. F, Deputy Bravo failed to follow the JIMS instruction to assign Plaintiff to a lower bunk.  2 Pl. App. 00093; 3 Pl. App. 00253–00254.  He also failed to indicate a lower bunk assignment on Plaintiff's face card to inform other housing deputies of Plaintiff's medical needs as required by policy.  2 Pl. App. 00082, 00087, 00093; Buchanan Decl. ¶ 8, Ex. F.  Deputy Simms was required to assign inmates to the appropriate bed based on the medical restrictions on Plaintiff's face card, but he did not do so due to Deputy Bravo's failure to make the appropriate notation.  2 Pl. App. 00086.  Based on this evidence, a reasonable jury could infer that had the County trained the housing deputies on

the need to review JIMS for medical instructions and carry out those instructions, Plaintiff would have received a lower bunk that afternoon.  A reasonable jury could further infer that Deputies Bravo and Simms' failure to give Plaintiff a lower bunk—resulting from the County's failure to train the housing deputies to follow through on the critical medical information identified during screenings—caused Plaintiff to suffer his injuries from his fall from the top bunk.

Finally, Plaintiff has presented sufficient evidence to show the County's failure to train, supervise, or discipline jail staff to respond to medical emergencies on the intercom caused his injuries.  The County's policy required jail staff to maintain the cell intercom systems for the means of relaying or summoning emergency assistance.  Buchanan Decl., Ex. H.  Deputy Campos failed to respond to the emergency intercom calls to provide inmates with the proper care.  *See* 3 Pl. App. 00264, 00306.  He claimed he checked the intercom to ensure it was functional, but he failed to respond to the calls from the emergency intercom system.  Campos Decl. ¶¶ 7–9; 3 Pl. App. 00264, 00306.  Plaintiff's emergency medical care was delayed almost forty-five minutes and, according to his expert, this delay caused him to suffer greater brain injury.  3 Pl. App. 00307, 00390-91; Pl. Video Ex. 1.  Based on this evidence, a reasonable jury could infer that had the cell tower deputies been properly trained, supervised, or disciplined on the policies requiring them to check and respond to the intercom system, Plaintiff would have received prompt emergency care and avoided the greater injury resulting from delayed treatment.

The totality of the above evidence is sufficient to create a genuine dispute of material fact as to whether the County's failure to train, supervise, or discipline medical staff to communicate and follow up on medical needs—specifically, the failure to follow up with the anti-seizure medication that evening in light of the medical screening identifying his medical needs—was the "moving force" behind Plaintiff's injuries.  *Long*, 442 F.3d at 1190.  This evidence is also sufficient to create a genuine dispute as to whether the County's failure to train the medical staff and custodial staff to effectively communicate

and coordinate to provide the needed lower bunk and emergency help was the "moving force" behind Plaintiff's injuries.

In addition to showing a causal link between Plaintiff's injuries and the County's purported failure to train, supervise, or discipline, Plaintiff must also create a triable issue of fact as to the County's deliberate indifference to Plaintiff's constitutional rights. To prove deliberate indifference to a need for better policies or training, a plaintiff must establish that the facts available to the county put it on "actual or constructive notice" that its deficient practices were "substantially certain to result in the violation of the constitutional rights of its citizens." *Sandoval v. County of San Diego*, 985 F.3d 657, 682 (9th Cir. 2021). This deliberate indifference standard "does not require proof of a prior injury"; "[a] constitutional injury can be substantially certain to follow from a practice even if an injury has yet to occur." *Id.* at 682.

Here, the Court finds that Plaintiff has pointed to evidence that the County knew that medical staff repeatedly failed to (1) properly follow up and provide the required medical treatment and (2) communicate and coordinate the care of these needs with the custodial staff. Plaintiff points to numerous instances of inmate deaths involving medical staff failures to follow up with proper treatment for medical needs identified during screenings. For example, Mr. Victorianne died because medical staff, despite identifying overdose symptoms and erratic behavior from his medical screening, sent him back to his cell without treatment. 4 Pl. App. 472. He died in his cell from the lack of medical treatment. 4 Pl. App. 473, 474. Similarly, nurses sent Mr. Cochran, who displayed clear signs of severe illness, back into the cell area without giving him medical treatment. 4 Pl. App. 548, 572. He died later that afternoon from diabetic ketoacidosis at the hospital. 4 Pl. App. 556. Mr. Nishimoto also died from suicide after nursing staff placed him in a regular cell instead of "enhanced observation" housing. 4 Pl. App. 590. They knew he had suicidal tendencies from his screening but failed to take action. 4 Pl. App. 590. From these instances and others in the record, the County was reasonably aware that its training, supervision, and discipline practices resulted in failures of followup, communication, and

coordination around serious inmate medical needs that had been identified during the medical screenings.  It was also aware that these failures resulted in several inmate deaths.  The Court therefore finds that the County had notice that its existing training, supervision, and discipline practices were not adequate and were substantially likely to result in a constitutional violation from the same failures.

The County was also on notice that medical staff repeatedly failed to communicate inmates' medical needs to custodial staff.  For example, Mr. Nesmith died because medical staff failed to communicate to the detention staff about his psychiatric condition and the need for monitoring.  4 Pl. App. 519.  As a result, Mr. Nesmith was left unmonitored, did not receive any medications, and committed suicide in his cell.  4 Pl. App. 517.  Similarly, medical staff failed to communicate to housing staff that Mr. Nunez compulsively and uncontrollably drank water as a result of a medical condition and needed to be kept away form a water source.  4 Pl. App. 583.  Housing staff placed Mr. Nunez by a water source, where he drank fatal amounts of water and died in his cell. 4 Pl. App. 581.  Based on these deaths from the failures to coordinate and communicate medical needs, the County was aware of the need to improve its training on communication between medical staff and detention staff.  From the findings of the 2016 San Diego Grand Jury investigation, the County was further aware that staff difficulty in accessing medical information from JIMS further exacerbated these communication breakdowns between medical and detention staff. *See* https://www.sandiegocounty.gov/content/sdc/grandjury/report15_16.html.

Finally, the County was on notice that its medical follow-up and  communication shortcomings extended to its emergency response system.  Mr. Boulanger's death and another prior incident revealed concerns about deputy failures to make sure the intercom system was operational in order to ensure adequate emergency medical responses to the intercom system.  4 Pl. App. 00598, 00599.

The Court finds that the above similar conduct evidence suffices to create a triable issue that the County was on notice of repeated breakdowns in the (1) proper coordination of medical information among jail staff and (2) follow up to ensure serious medical needs

are met.   Because these same failures had already harmed numerous prior inmates, the Court concludes that a reasonable jury can infer from this evidence that the County knew its continued failure to train, supervise, or discipline was substantially likely to result in other inmates suffering injury.   The Court therefore denies the County's motion for summary judgment on the *Monell* claim.   *Gordon*, 6 F.4th at 974 (requiring plaintiff to identify record evidence of "any other event involving similar conduct or constitutional violations" to survive summary judgment); *Cooper v. Whatcom County*, No. 20-01196, 2023 WL 157572, at *21 (W.D. Wash. Jan. 11, 2023) (denying summary judgment for the county on a *Monell* claim where plaintiffs pointed to "evidence of other inmates who have died while in custody, allegedly after receiving inadequate medical care at the jail due to similar policies and practices" to show a pattern of systemic indifference attributable to the county).

The Court finds the County's arguments against *Monell* liability lack merit.   The County argues that no *Monell* liability exists because Officer Defendants did not violate Plaintiff's constitutional rights.   The Court has already denied summary judgment for Officer Defendants on the deliberate indifference claims so this argument fails for the same reasons.   The County also argues that a pattern of similar constitutional violations, not merely similar misconduct, must exist to put the County on notice that they needed to better train employees.   The Court rejects this argument.   The Ninth Circuit is clear that the requisite notice can come from any available facts showing that a constitutional violation was substantially likely; proof of prior injury is not required.   *Sandoval*, 985 F.3d at 682. By the same reasoning, proof of prior adjudicated constitutional violations is also not required.   *Id.*

### 2. Direct Liability for Supervisors

Plaintiff also brought direct liability claims against Supervisory Defendants for the same failure to train, supervise, or discipline jail employees that it alleges against the

County.[5]   A supervising official can be personally liable for the unconstitutional conduct of his or her subordinates under certain circumstances.  "A supervisor will rarely be directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury." *Larez v. City of Los Angeles*, 946 F.2d 630, 645 (9th Cir. 1991).   Even if a supervisory official is not directly involved in the allegedly unconstitutional conduct, he or she "can [still] be liable in this individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011) (citation omitted).  In such cases, "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation" must exist.  *Jeffers v. Gomez*, 267 F.3d 895, 915 (9th Cir. 2001).  "The critical question is whether it was reasonably foreseeable [to the supervisor] that the actions" of his or her subordinates would lead to the violations of the plaintiff's constitutional rights which are alleged to have occurred.  *Kwai Fun Wong v. United States*, 373 F.3d 952, 966 (9th Cir. 2004), *abrogated on other grounds by Pettibone v. Russell*, 59 F.4th 449 (9th Cir. 2023).

Here, Plaintiff has raised a triable issue as to Supervisory Defendants' personal culpable inaction in the failure to train, supervise, or discipline their subordinates.  With regard to Sheriff Gore, Plaintiff points to evidence from which a reasonable jury can infer that Sheriff Gore implemented a constitutionally deficient prison training policy that was the moving force behind Plaintiff's violation.  *See Jeffers*, 267 F.3d at 914.  Sheriff Gore was in charge of the hiring, training, supervision, discipline, and control of all San Diego County Sheriff's Department custodial employees and medical staff.  Gore Decl. ¶¶ 1, 2, 3.  As Sheriff, he was also directly involved in policymaking for the Sheriff's Department.  Gore Decl. ¶ 10.  Sheriff Gore thus had authority over the County's policies and their

---

[5] Plaintiff brought a separate claim for deliberate indifference against Supervisory Defendants, which the Court construes as the same supervisory failure to train claim.

implementation.  From reviewing and signing off on CIRB reports, Sheriff Gore also had knowledge of the numerous instances of inmate deaths discussed above and the circumstances surrounding them.  From this evidence, a reasonable jury could infer that Sheriff Gore knew that his training policies gave rise to repeated medical staff failures to follow up to ensure treatment of inmates' medical needs and jail staff failures to properly communicate and coordinate the care of those needs between departments.  Plaintiff has thus raised a triable issue that, despite this obvious need for more or different training, Sheriff Gore failed to implement a better training policy or take other action to prevent future occurrences.  *See* Buchanan Decl. ¶ 4; 4 Pl. App. 466, 476, 523, 585, 608; *Jeffers*, 267 F.3d at 914.

Plaintiff has also provided evidence from which a reasonable jury could infer that Sheriff Gore's failure to implement better training, supervision, or discipline caused Plaintiff's injury.  As explained above, Plaintiff has provided evidence that Nurse Germono did not follow County policies to provide him with his anti-seizure medication, and the medical staff and the custodial staff failed to communicate regarding his medical need for a lower bunk, which caused him to suffer his injury.  He has also provided evidence that Deputy Bravo was required to assign inmates based on their identified medical needs in JIMS but failed to do so, and Deputy Campos was required to respond to emergency intercom responses but did not do so.  He has further provided evidence of numerous similar failures to provide follow-up medical care and effectively coordinate that care between different divisions.  Drawing inferences in favor of Plaintiff, the Court finds that a reasonable jury could find Sheriff Gore's failure to take action to address these failures was a moving force behind Plaintiff's injury—that a better trained staff would have followed County policy and provided Plaintiff his prescription anti-seizure medication, a lower bunk,  and emergency medical help and thus prevented his injury.  Accordingly, the Court concludes that Plaintiff has raised a triable issue that it was reasonably foreseeable to Sheriff Gore that the actions of his medical and custodial staff subordinates would lead

1    to Plaintiff's alleged constitutional injury.   The Court therefore denies Sheriff Gore's

2    motion for summary judgment on the supervisory liability claims.

3        Plaintiff has similarly pointed to evidence of Dr. Joshua's and Ms. Lee's own

4    culpable inaction in failing to train with specific regard to the medical staff.   These

5    Supervisory Defendants were in charge of training and supervising the medical staff and

6    implementing the policies for the medical and nursing staff.   Dr. Joshua supervised and

7    oversaw quality assurance for the medical staff in the County jails.   Joshua Decl. ¶¶ 2, 3.

8    Ms. Lee supervised the medical and nursing staff and oversaw administration duties, which

9    included ensuring that medical staff were licensed and trained on the policies and

10   procedures of the County jails.   Lee Decl. ¶¶ 1, 2.   Dr. Joshua and Ms. Lee attended the

11   CIRB meetings and discussed policy deficiencies regarding medical staff failures to

12   address and coordinate medical needs following a medical screening.   *See* 4 Pl. App. 478,

13   519, 525, 526, 569, 583, 586, 590, 594, 610, 615, 622, 627.   They were therefore aware of

14   the incidents discussed above and the repeated failures in follow-up care, communication,

15   and coordination involved in those deaths.   For the reasons set forth above, a reasonable

16   jury could infer that Dr. Joshua and Ms. Lee were on notice of medical staff failures to

17   follow up with treatment for medical conditions and communicate that information to

18   detention staff; that based on this notice, they had reason to believe that similar injuries

19   could occur to inmates in the future if they did not take any action to fix this misconduct

20   with better training; and their failure to train was the cause of Plaintiff's injury.   *Clement*

21   *v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002) (finding supervisors deliberately indifferent

22   where they were on actual or constructive notice of a need to train on pepper spray use

23   based on numerous prior instances of inmates harmed by the use of pepper spray but failed

24   to do so).   The Court therefore denies Dr. Joshua's and Ms. Lee's motion for summary

25   judgment on the supervisory liability claims.

26        *3. Supervisory Defendants' Qualified Immunity*

27        Supervisory Defendants argue that qualified immunity shields them from Plaintiff's

28   Section 1983 claims because clearly established law did not put them on notice that their

conduct was unlawful.  Supervisors sued in an individual capacity in a Section 1983 action may assert a qualified immunity defense, which precludes liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).    To determine whether an officer is entitled to qualified immunity, the court evaluates two questions: (1) whether the officer's conduct violated a constitutional right, and (2) whether that right was "clearly established" at the time of the incident.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).   A right is clearly established if "the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1065 (9th Cir. 2006).   This means that the court looks to "whether a reasonable officer would recognize that his or her conduct violates that right under the circumstances faced, and in light of the law that existed at that time."  *Kennedy*, 439 F.3d at 1065 (citing *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).   As to the law that existed at the time, the court "need not find a prior case with identical, or even materially similar facts;" it is enough that "the preexisting law provided the defendants with fair warning that their conduct was unlawful."  *Kennedy*, 439 F.3d at 1065 (internal quotations omitted).   If the right is not clearly established, the defendant is entitled to qualified immunity.  *Lawrence v. U.S.*, 340 F.3d 952, 955 (9th Cir. 2003) (citing *Creighton*, 483 U.S. at 641).   If the right is clearly established, the court determines "whether the defendant's conduct was 'objectively legally reasonable' given the information possessed by the defendant at the time of his or her conduct."  *Id.* (quoting *Creighton*, 483 U.S. at 641).

The Court finds that qualified immunity does not protect Sheriff Gore from Section 1983 liability because clearly established law put him on notice that his conduct was unlawful.  As explained above, it is clearly established that supervisory prison officials may not turn a blind eye or acquiesce in their subordinates' constitutional violations.  *Starr*, 652 F.3d at 1208.  Thus, if a supervisory prison official knows that his subordinates are

violating clearly established rights, his failure to take action to stop such conduct also violates constitutional rights. *Id.* Existing case law at the time of Plaintiff's incident also makes clear the unlawfulness of denying necessary prescription medication, a lower bunk to an inmate who faces a risk of serious injury without one, and medical emergency response care. *Gibson v. County of Washoe,* 290 F.3d 1175, 1194–96 (9th Cir. 2002), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016); *Akhtar v. Mesa*, 698 F.3d 1202, 1213–1214 (9th Cir. 2012); *Clement v. Gomez*, 298 F.3d 898, 907 (9th Cir. 2002). In *Gibson,* the Ninth Circuit held that when a medical screening indicates an urgent need for medical treatment to prevent serious injury, a jail's medical staff must follow up to provide medical attention within a reasonably immediate time. *Gibson,* 290 F.3d at 1194–96; *see also Wakefield v. Thompson*, 177 F.3d 1160, 1165 (9th Cir. 1999) (holding that a prison has a constitutional duty to provide an outgoing inmate with his prescription medications upon release until he can obtain the medications himself). The Ninth Circuit also held that a prison official must comply with an inmate's need for a lower bunk to prevent the significant risk of harm from serious medical conditions. *Akhtar*, 698 F.3d at 1213–1214. Finally, the Ninth Circuit ruled a prison official cannot ignore calls for emergencies by inmates or delay access to medical care. *Clement*, 298 F.3d at 907. The above cases, in combination, clearly establish that a jail supervisor cannot turn a blind eye to subordinate actions that would reasonably result in a denial of the above rights.

In light of this clearly established law, a reasonable officer in Sheriff Gore's position would know that turning a blind eye to his subordinates' numerous failures in providing medical care could result in a violation of Plaintiff's constitutional rights. As discussed above, Sheriff Gore knew of repeated failures of medical and custodial staff to provide adequate medical care. Sheriff Gore could reasonably foresee based on these past failures that his subordinates' actions, if left unchecked, could result in the denial of required medications, bunk assignments, and emergency care. Despite his knowledge of these

failures, however, Sheriff Gore did not act to implement a better training policy.  The Court therefore denies qualified immunity for Sheriff Gore.

A reasonable supervising official in Dr. Joshua's or Ms. Lee's positions would also know that their failure to train their medical subordinates to follow up on providing medical care and communicate serious medical needs was unlawful.  As explained above, these defendants also knew of numerous medical staff failures to provide and coordinate adequate medical treatment following a screening in the years leading up to Plaintiff's incident.  From this knowledge, Dr. Joshua and Ms. Lee should have known that without further action their subordinates could repeat these failures and violate other inmates' constitutional rights, but they failed to act or implement better policies or training.  *Perez v. Cox*, 788 Fed. Appx. 438, 443–444 (9th Cir. 2017) (unpublished) (denying qualified immunity for supervisory officials for their knowledge of the risk of using birdshot in prison where three years before the plaintiff's death, several inmates and three staff members were also previously injured by birdshot).  In light of the clearly established law discussed above, a reasonable high level medical official confronted with the personal knowledge of repeated inmate deaths from his or her subordinates' failures would know that his or her failure to train those subordinates was unlawful and could cause constitutional violations.  Accordingly, the Court denies qualified immunity for Dr. Joshua and Ms. Lee.

**C. Disability Discrimination Claims Under the ADA and Rehabilitation Act**

The Court next examines whether Plaintiff has raised a triable issue as to his ADA and Rehabilitation Act claims against the County.  Both the ADA and Rehabilitation Act prohibit disability discrimination in jails.  *Armstrong v. Wilson*, 124 F.3d 1019, 1024 (9th Cir. 1997) (holding that ADA and Rehabilitation Act applied to inmates in state correctional system).  A public entity is liable under the ADA and Rehabilitation Act for the vicarious acts of its employees.  *Duvall v. County of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001).  To establish a violation, a plaintiff must show he is a qualified individual with a disability, a public entity denied him the benefits of services, programs, or activities, and

such denial was by reason of his disability.  *Id.*  A public entity's failure to provide a reasonable accommodation when an individual requires these accommodations may constitute such denial of benefits by reason of disability.  *Pierce v. County of Orange*, 526 F.3d 1190, 1215 (9th Cir. 2008) (citing regulations).  To recover monetary damages under the ADA or Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the defendant.  *Duvall*, 260 F.3d at 1138.  In order to do so, a plaintiff must prove he put the public entity on notice by alerting it to his need for accommodation, unless the need for accommodation is "obvious or required by statute or regulation."  *Id.* at 1139–40.  Then, the public entity's failure to act "must be a result of conduct that is more than negligent, and involves an element of deliberateness."  *Id.* at 1139.

First, the County argues that Plaintiff did not alert the public entity to his need for an accommodation.  To raise a triable issue to the contrary, Plaintiff points to evidence that he told medical staff he suffered from seizures and Nurse Germono wrote an "Epilepsy" diagnosis in Plaintiff's medical file.  1 Pl. App. 00061.  Based on the epilepsy diagnosis in his file, a reasonable jury could infer that Plaintiff alerted the County to his need for an accommodation based on his seizure disorder.

The County further argues that Officer Defendants did not intentionally discriminate against Plaintiff.  The Ninth Circuit analyzes intentional discrimination under the deliberate indifference standard requiring knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood.  *Duvall*, 166 F.3d at 1139.  The Court has already denied Officer Defendants' motions for summary judgment on the basis that Plaintiff has raised a triable issue of whether they acted in deliberate indifference.  The Court therefore denies summary judgment for the County on this ground for the same reason.

Finally, the County argues that Plaintiff's seizure disorder does not qualify as a disability as a matter of law and, therefore, the denial of a lower bunk was not a failure to accommodate under the ADA and Rehabilitation Act.  An episodic impairment, such as epilepsy, is a disability if it substantially limits a major life activity when active.  42 U.S.C.

§ 12102(4)(D).  ADA regulations specifically recognize epilepsy as a physical impairment and note that epilepsy qualifies as a disability because it substantially limits neurologic function.  28 C.F.R. § 35.108(b)(2), (d)(2).  Moreover, courts have held that a jail staff's failure to assign an epileptic inmate a lower bunk can form the basis of a reasonable accommodation claim.  *See, e.g.*, *Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 284 (1st Cir. 2006); *Ramos v. Monteiro*, No. 06-0832, 2008 WL 4184644, at *25 (C.D. Cal. Sept. 8, 2008).

Here, Plaintiff has provided evidence that Nurse Germono inputted Plaintiff's diagnosis as epilepsy and assigned a lower bunk designation.  1 Pl. App. 00061, 00063; 2 Pl. App. 00086.  Plaintiff has further provided evidence that Deputy Bravo and Simms did not give him a lower bunk despite knowing the lower bunk designation and knowing his seizure disorder warranted one.  Because the law is clear that an episodic impairment such as epilepsy qualifies as a disability under the ADA, and that a lower bunk may constitute a reasonable accommodation, there is a triable issue for the jury as to whether the failure to provide Plaintiff, an individual with epilepsy, with a lower bunk accommodation violated the ADA and Rehabilitation Act.  Accordingly, the Court denies the County's motion for summary judgment on these claims.

**D. State Law Claims**

Finally, the Court examines whether Plaintiff has raised a triable issue as to his state law claims for negligence against the County and Bane Act violations against the County and Supervisory Defendants.

*1. Negligence*

Plaintiff brought a negligence claim against the County under a theory of *respondeat superior* based on Defendant Michael Campos's conduct.  The County seeks summary judgment on this claim on two grounds: (1) Deputy Campos was not liable for negligence and the County therefore cannot be held vicariously liable; and (2) California Government Code Section § 844.6 bars Plaintiff's negligence claim.  First, the County argues that Deputy Campos was not liable for negligence because Plaintiff failed to exhaust this claim

under the Government Claims Act.  The Court has already denied Deputy Campos's motion for summary judgment on this ground, finding Plaintiff sufficiently exhausted the negligence claim by identifying the injury he suffered and presenting the central facts known to him regarding the cause of the injury.  Although Plaintiff's claim did not specify in detail all the events that resulted in his injury, the Government Claims Act does not require such granular specificity.  *See Stockett v. Assoc. of Cal. Water Agencies Joint Powers Ins. Auth.*, 99 P.3d 500, 503 (Cal. 2004) (holding claim "need not specify each particular act or omission later proven to have caused the injury" for exhaustion).  The Court therefore denies summary judgment for the County for the same reason.

Second, the County argues that California Government Code Section 844.6 bars Plaintiff's negligence claim.  Section 844.6 grants immunity to public entities for an injury to a prisoner, with certain exceptions.  Cal. Gov. Code § 844.6.  One exception provides that public entities and employees are not immune "if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care."  Cal. Gov. Code § 845.6.  Here, Plaintiff's negligence claim is predicated on failure to provide emergency care as set forth in California Gov. Code Section § 845.6.  Because such claims are excepted from Section 844.6's general grant of immunity to public entities, the Court denies the County's motion for summary judgment on this ground.

### 2. Tom Bane Civil Rights Act, Cal. Civ. Code § 52.1

The County seeks summary judgment on Plaintiff's Bane Act claim on the basis that Officer Defendants are not liable and therefore it cannot be held vicariously liable.  The Court has already denied summary judgment on this claim against Officer Defendants and denies summary judgment for the County for the same reasons.

Supervisory Defendants also seek summary judgment on Plaintiff's Bane Act claim on the grounds that such claims cannot be premised on a supervisory liability.  They have not identified any binding case law to support their argument.  The California Supreme Court has implicitly held that a Bane Act claim can be brought against a sheriff based on

31

his supervisory conduct. *See Venegas v. County of Los Angeles*, 87 P.3d 1, 14 (Cal. 2004) (affirming lower court finding that plaintiff could bring Bane Act claim against the County, its sheriff's department, and its sheriff based on conduct of sheriff's deputies). For these reasons, the Court denies Defendants' motions for summary judgment on Plaintiff's Bane Act claim.

## IV. CONCLUSION

For the reasons discussed above, the Court denies the County's and Supervisory Defendants' motions for summary judgment [Dkts. 208, 211].

**IT IS SO ORDERED**.

Dated: March 1, 2023

_____

Honorable Jinsook Ohta
United States District Judge