BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
JAMES M. DAVIS (301636)
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
jdavis@bholaw.com

Attorneys for Intervenors The San Diego
Union-Tribune, LLC, Prison Legal News,
and Voice of San Diego

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANKIE GREER | Case No. 3:19-cv-0378-JO-DEB |
| Plaintiff, | |
| v. | **MEMORANDUM IN SUPPORT OF THE SAN DIEGO UNION TRIBUNE, LLC, PRISON LEGAL NEWS, AND VOICE OF SAN DIEGO'S MOTION TO INTERVENE AND UNSEAL CRITICAL INCIDENT REVIEW BOARD DOCUMENTS** |
| COUNTY OF SAN DIEGO, et al., | |
| Defendants. | **[ECF NO. 307-2]** |

**DATE:**         April 26, 2023
**TIME:**         9:00 a.m.
**JUDGE:**       Jinsook Ohta
**COURTROOM:** 4C

District Judge Jinsook Ohta
Courtroom 4C, Schwartz
Magistrate Judge Daniel E. Butcher
Courtroom 2B, Schwartz

Complaint Filed:  February 25, 2019
Trial Date:        Not Yet Set

1

## TABLE OF CONTENTS

2
**Page**

3   INTRODUCTION ..................................................................................................... 1

4   FACTS AND PROCEDURAL HISTORY ................................................................ 2

5   ARGUMENT ............................................................................................................ 8

6   I.    The Court Should Allow Media Intervenors to Intervene for the Limited
        Purpose of Seeking to Unseal CIRB Reports.................................................. 8

7

8   II.   The Court Should Unseal the Exhibits Lodged in Support of Dispositive
        Motions............................................................................................................ 12

9   CONCLUSION ....................................................................................................... 16

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLOOD HURST & O' REARDON, LLP

i                              Case No. 3:19-cv-00378-JO-DEB

MEMO ISO INTERVENORS' MOTION TO INTERVENE AND UNSEAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLOOD HURST & O' REARDON, LLP

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Beckman Indus., Inc. v. Int'l Ins. Co.*,
  966 F.2d 470 (9th Cir. 1992) ................................................................. 8

*City of Los Angeles v. Super. Ct.*,
  41 Cal. App. 4th 1083 (1996) .............................................................. 15

*Doe v. City of San Diego*,
  No. 12-CV-689-MMA-DHB, 2014 WL 1921742
  (S.D. Cal. May 14, 2014) ............................................................... 8, 15

*Doe v. Marsalis*,
  202 F.R.D. 233 (N.D. Ill. 2001) ......................................................... 14

*EEOC v. Nat'l Children's Ctr., Inc.*,
  146 F.3d 1042 (D.C. Cir. 1998) ......................................................... 8, 9

*FTC v. Standard Fin. Mgmt. Corp.*,
  830 F.2d 404 (1st Cir. 1987) .............................................................. 13

*Globe Newspaper Co. v. Super. Ct.*,
  457 U.S. 596 (1982) ............................................................................ 8

*Gomes v. Fried*,
  136 Cal. App. 3d 924 (1982) .............................................................. 15

*Kamakana v. City & Cnty. of Honolulu*,
  447 F.3d 1172 (9th Cir. 2006) ...................................................... 12, 13

*King v. Conde*,
  121 F.R.D. 180 (E.D.N.Y. 1988) ....................................................... 15

*In re Knoxville News-Sentinel Co., Inc.*,
  723 F.2d 470 (6th Cir. 1983) ............................................................. 13

*Liberte Capital Grp., LLC v. Capwill*,
  126 Fed. Appx. 214 (6th Cir. 2005) ................................................... 11

00200264

*Mendez v. City of Gardena*,
  222 F. Supp. 3d 782 (C.D. Cal. 2015) ........................................................*passim*

*Meyer Goldberg, Inc., v. Fisher Foods, Inc.*,
  823 F.2d 159 (6th Cir. 1987) ................................................................... 9

*Nixon v. Warner Commc'ns, Inc.*,
  435 U.S. 589 (1978) ....................................................................... 12, 13

*Oliner v. Kontrabecki*,
  745 F.3d 1024 (9th Cir. 2014) ........................................................ 12, 13

*Pratt & Whitney Canada, Inc. v. U.S.*,
  14 Cl. Ct. 268 (1988) ............................................................................ 13

*Pub. Citizen v. Liggett Grp., Inc.*,
  858 F.2d 775 (1st Cir. 1988) ................................................................ 11

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980) .............................................................................. 15

*San Jose Mercury News, Inc. v. U.S. Dist. Ct.*,
  187 F.3d 1096 (9th Cir. 1999) ................................................................ 8

*United Nuclear Corp. v. Cranford Ins. Co.*,
  905 F.2d 1424 (10th Cir. 1990) ...................................................... 10, 11

*Welsh v. City & County of San Francisco*,
  887 F. Supp. 1293 (N.D. Cal. 1995) .................................................... 14

**Other Authorities**

Fed. R. Civ. P. 24(b) ..................................................................*passim*

BLOOD HURST & O' REARDON, LLP

Pursuant to Fed. R. Civ. P. 24(b), The San Diego Union-Tribune, LLC, Prison Legal News ("PLN"), and Voice of San Diego (collectively, "Media Intervenors") seek to intervene in this action for the purpose of requesting that the exhibits offered by the parties in support of their dispositive motions, ECF No. 307-2, be unsealed and thus available for public inspection. This case involves substantial public interest and compelling reasons do not exist to keep these records under seal.

## INTRODUCTION

Proposed Media Intervenors are news organizations that have reported on the San Diego County Sheriff's Department, including the deaths and injuries of inmates in the Sheriff Department's care. As a result of this news coverage, these deaths and injuries have received widespread media coverage and are matters within the public's interest. The problems with the Sheriff's Department and the jails it operates have been the focus of numerous lawsuits, audits by the California State Auditor, and a primary focus of the 2022 Sheriff's election.

Here, Media Intervenors seek to intervene to make public critical documents about these matters created by the Sheriff Department's "Critical Incident Review Board." Specifically, they intervene for the purpose of requesting that the exhibits offered by the parties in support of their dispositive motions, ECF No. 307-2, be unsealed so the public may inspect them. Media Intervenors believe these documents will assist the public in understanding the reason for the high rate of injuries and deaths of those in the Sheriff's custody and are needed to hold the Sheriff's Department accountable to the public.

Media Intervenors seek to intervene pursuant to Fed. R. Civ. P. 24(b) because reports and other documents created by the CIRB have been filed under seal in the above-entitled matter, but the parties to this action have reached a settlement, so without intervention for the limited purpose of seeking to have these documents unsealed, these documents will remain sealed and unavailable to the public.

BLOOD HURST & O' REARDON, LLP

**FACTS AND PROCEDURAL HISTORY**

A review of the record reveals that Plaintiff Frankie Greer fought hard to obtain the documents at the heart of this motion. Plaintiff alleges that when he was booked into the San Diego County Jail, he gave medical staff his prescribed seizure disorder medication and informed them he would suffer chronic seizures without it. ECF No. 59, ¶¶ 29–31. Medical staff failed to administer Plaintiff's medication, enter a seizure disorder alert, enter a lower bunk assignment order in the Jail Information Management System ("JIMS"), or otherwise communicate Plaintiff's medical condition and attendant needs to jail staff. *Id.*, ¶¶ 36, 38, 41 and 43.

After failing to give Plaintiff two doses of seizure medication and despite the need for a bottom bunk, jail staff assigned him to a top bunk. *Id.*, ¶¶ 42, 44, 45–53. Shortly thereafter, Plaintiff suffered a seizure and fell from his top bunk onto the concrete floor, rendering him unconscious. *Id.*, ¶¶ 55–57. Jail staff did not respond to Plaintiff's cellmates' intercom calls and shouts for help, delaying medical treatment. *Id.*, ¶¶ 57–66, 69–71, 73. Plaintiff suffered "numerous clinical seizures" without receiving immediate emergency medical care, exacerbating his injuries. *Id.*, ¶¶ 72–73. Plaintiff sustained facial fractures, a brain bleed, and respiratory failure. *Id.*, ¶ 74. Plaintiff remained unconscious for weeks. He now has a significant brain injury that impairs his cognitive functioning, memory, and speech. *Id.*, ¶¶ 78–79, 81.

During discovery, Plaintiff served requests for production of documents seeking Critical Incident Review Board ("CIRB") "reports or memoranda" and "records, materials, and tangible things" provided to CIRB during its investigation of twelve County jail deaths that preceded Plaintiff's seizure, fall, and injury. ECF No. 148-3 at 20–25.

CIRB consists of three "voting" members (one commander each from Law Enforcement, Court Services, and Detention Services divisions), and two "non-voting" members (the Chief Legal Advisor and Human Resources division commander). ECF No. 148-4 at 78. In addition to CIRB members, meeting attendees

2

BLOOD HURST & O' REARDON, LLP

include the assigned investigator and representatives from the subject employee's chain of command, the Division of Inspectional Services ("DIS"), Internal Affairs, and Training. *Id*. The CIRB can request additional personnel attend the meeting. *Id*.

At the conclusion of the CIRB's review, the voting members determine whether a policy violation may exist. ECF No. 148-4 at 79. If a policy violation is found, the matter is forwarded to Internal Affairs for further investigation. *Id*. The CIRB also is authorized to recommend policy changes and training. *Id*. at 80.

Following a CIRB meeting, the DIS Lieutenant writes a report that must "contain specific findings with regard to whether the review board found any policy violations, and training or policy issues, as well as what actions were taken by the department." *Id*. Any employees under review are "debriefed" regarding the CIRB's findings. *Id.*

The Sheriff's Department requires the CIRB to review all "critical incidents." *Id*. at 78. The CIRB is the only mandatory internal review of deputy conduct related to in-custody deaths to determine, for example, whether the deputy's tactics were proper and consistent with training. *Id*. at 118-19.

The Sheriff's Department Policy and Procedures Manual details the CIRB's multiple purposes: (1) "assess the department's civil exposure as a result of a given incident" (described as the "focus of the CIRB"); (2) "determine as to whether or not a policy violation may exist"; (3) make "recommendations for training based upon the analysis of critical incidents"; (4) identify any "policy issues of concern"; and (5) "debrief [the employee] as to the results of the CIRB." *Id*. at 78-80.

Consistent with the CIRB's multiple purposes unrelated to obtaining legal advice, the Sheriff's Department holds the CIRB out to the public as an internal body dedicated to police accountability and oversight. *Id*. at 819. For example, the Sheriff's Department describes the CIRB as an internal oversight board that supports the Sheriff's Department's "dedicat[ion] to building a culture of trust with our communities . . . . ; [efforts to be] proactive in the identification of possible

BLOOD HURST & O' REARDON, LLP

opportunities for change in our policies, procedure, and training to affect consistent positive outcomes . . . ; [and] commit[ment] to [the] impartial and compassionate enforcement of the law." *Id*. And on June 9, 2020, shortly after the eruption of nationwide protests in response to the death of George Floyd, the Sheriff's Department identified the CIRB as an internal oversight board that represents the Department's "commit[ment] to impartial and compassionate enforcement of the law" and efforts to be "proactive in the identification of possible opportunities for change in our policies, procedure, and training to affect consistent positive outcomes." *Id*. at 83. The Sheriff's Department also said that, to honor this commitment, its "leadership team reviews all critical incidents to ensure proper and just responses were administered . . . . [and its] CIRB carefully reviews the incidents from multiple perspectives – including training, tactics, policies, and procedures – with the goal of identifying problem areas and recommending remedial actions." *Id*. at 83-84.

In this case, the County went to extraordinary lengths to prevent disclosure of the CIRB reports sought by Plaintiff. Over the County's objections, the Court ruled that the documents sought were relevant and proportionate to Plaintiff's *Monell* claims. ECF No. 117. The County filed a motion to reconsider the Court's discovery order. ECF No. 121. On July 27, 2022, the Court overruled the County's objections to the Discovery Order. ECF No. 173. Still, the County refused to produce all of the CIRB documents requested, asserting that they were protected from disclosure by the attorney-client privilege and work product doctrine, among other claimed protections. ECF No. 148-3. Plaintiff filed a Motion to Compel production of the CIRB documents. ECF No. 148. On October 7, 2022, the Court granted Plaintiff's Motion and ordered the County to produce the CIRB documents. ECF No. 226. On October 20, 2022, the County filed a motion to reconsider the Court's discovery ruling on Plaintiff's Motion to Compel, once again asserting that the CIRB reports were protected by the attorney-client privilege and work product doctrine. ECF No. 232.

On December 9, 2022, the Court overruled the County's objections to the ruling on Plaintiff's Motion to Compel. ECF No. 267. On December 21, 2022, after the Court conducted an in-camera review of the CIRB documents, the Court once again ordered the County to produce the CIRB documents with the redactions agreed by Plaintiff. ECF No. 276. On January 6, 2023, the County petitioned the Ninth Circuit Court of Appeals seeking a writ of mandamus directing the district court to vacate its orders requiring the County to produce the CIRB documents. ECF No. 286. The Ninth Circuit denied the County's petition the same day. ECF No. 287. On January 25, 2023, Plaintiff, having received the CIRB reports, filed an *ex parte* motion to file conditionally under seal Plaintiff's Opposition to the County's Motion for Summary Judgment and the accompanying exhibits (the CIRB documents). ECF No. 304. Plaintiff further argued that a permanent sealing of the documents is not warranted because the documents are not privileged and there is no legitimate basis for keeping them from the public. *Id*. The Court granted Plaintiff's Motion to Seal on January 25, 2023. ECF No. 305. Plaintiff filed its Opposition to the County's Motion for Summary Judgment on January 25, 2023. ECF No. 307. Certain facts derived from the CIRB reports, and the reports themselves, were filed under seal. *Id*. *See also* ECF No. 307-2.

On February 22, 2023, Mr. Greer filed a motion to unseal the CIRB documents with the exception of two pages which would remain redacted. ECF No. 337. He argued that as to the rest of the CIRB documents, there was no basis for permanently sealing them. ECF No. 337-1 at 2. Mr. Greer alleged that contrary to the repeated assertions by the County of San Diego that "'CIRB reports have always been treated as protected attorney-client communications and maintained in [Robert Faigin's] office in the legal affairs section of the office of the sheriff,'" in fact many of these documents were disseminated to others. *Id*. (citation omitted). Some of these documents were left in an unlocked compartment in an unlocked office accessible to staff. ECF No. 337-2 (Declaration of David Myers, ¶¶ 13-14). These documents

contained handwritten notes and observations from CIRB meetings. *Id*., ¶ 14. Mr. Faigin represented the interests of Sheriff William Gore, not the Department. *Id*., ¶ 15. Commander Myers could recall no Board member ever asking Mr. Faigin for legal advice during CIRB meetings. *Id*., ¶ 16. After the meetings, DIS documented the findings and recommendations of the board. *Id*., ¶ 17. The final reports were findings on training expectations, policy changes and recommendations on tactics. *Id*. Commander Myers has no recollection of these reports expressing any legal opinions. *Id*. Based on his experience, Commander Myers did not consider the CIRB a risk management tool implemented to keep the circumstances surrounding and causes of critical incidents shrouded in secrecy. *Id*., ¶ 18. Instead, the CIRB's focus was on accountability, policy changes and training of personnel on all levels. It was a tool designed to identify how to do things better, if needed, going forward. *Id*.

On March 1, 2023, the Court issued an order denying the motions for summary judgment by the County and the supervisory defendants. ECF No. 355. In it, the Court made numerous factual findings that referenced the CIRB documents that remain under seal. *Id*. at 6–8. The Court discussed the CIRB reports related to the deaths of Kristopher Nesmith, Jerry Cochran, Jason Nishimoto, Ruben Nunez, Heron Moriarty, Richard Boulanger, and Daniel Sisson, and referenced the page numbers of the sealed documents. *Id*.

On March 2, 2023, Mr. Greer filed a notice of settlement. ECF No. 356. On March 3, 2023, the Court vacated all pending motions as moot. ECF No. 357. Thus, the Court did not rule on Mr. Greer's motion to unseal these CIRB documents.

**The Intervening Parties**

Prison Legal News (PLN) is a project of the Human Rights Defense Center, a 501(c)(3) non-profit corporation. *See* Ex. 1, Declaration of Paul Wright, ¶ 1. PLN publishes the monthly newspaper, Prison Legal News, and maintains a website. Both report on issues relating to prisoners' rights and other prison-related news. *Id*., ¶ 2. PLN has covered such varied jail-related topics as court access, disciplinary hearings,

jail conditions, use of excessive force, mail censorship, jail litigation, visitation issues, and the Prison Litigation Reform Act. *Id*., ¶ 3. PLN has extensively covered alleged constitutional abuses in the San Diego County jails. *Id.*, ¶ 4.

Voice of San Diego is a non-profit news organization serving the San Diego, California area. *See* Ex. 2, Declaration of Scott Lewis, ¶ 1. Voice of San Diego launched in 2005. Its mission is to pursue investigative journalism for a better San Diego. *Id.*, ¶ 2. It produces articles, podcasts, live events and other media to help educate San Diego residents about how their government functions and uncover issues and problems they would not know about without dedicated, professional reporters. *Id.*

In pursuing its mission, Voice of San Diego has an interest in ensuring documents created by governmental agencies be made public, including those documents evaluating an agency's performance. *Id.*, ¶ 3.

The San Diego Union Tribune, LLC ("Union Tribune"), publishes a daily newspaper and maintains a website, www.sandiegouniontribune.com, that is a leading news source for news about San Diego County. These news products have more than 100,000 paid subscribers. *See* Ex. 3, Declaration of Jeff Light, ¶ 2.

The Union-Tribune regularly publishes articles for its broad public audience on law enforcement and criminal justice issues. The news organization has covered extensively the problems at the San Diego County jails where 185 men and women have died while in custody between 2006 and 2020, another 18 in 2021 and 20 last year. *Id.*, ¶ 3.

The Union-Tribune reported specifically on this case. In addition, the Union-Tribune has covered San Diego Sheriff Kelly Martinez's pledge to release reports from the San Diego Sheriff's Critical Incident Review Board, an internal department panel that examines cases of deputy misconduct and error – and her later reversal and refusal to release the full reports once in office. *Id.*, ¶ 4.

BLOOD HURST & O' REARDON, LLP

00200264

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLOOD HURST & O' REARDON, LLP

**ARGUMENT**

**I.    The Court Should Allow Media Intervenors to Intervene for the Limited Purpose of Seeking to Unseal CIRB Reports**

"Nonparties seeking access to a judicial record in a civil case may do so by seeking permissive intervention under Rule 24(b)(2)." *San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096, 1100 (9th Cir. 1999); *see also Doe v. City of San Diego*, No. 12-CV-689-MMA-DHB, 2014 WL 1921742, at *1 (S.D. Cal. May 14, 2014). Every "circuit court that has considered the question has come to the conclusion that nonparties may permissively intervene for the purpose of challenging confidentiality" or sealing of judicial records. *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1045 (D.C. Cir. 1998). Courts have permitted the media to intervene to unseal documents where the parties have reached a settlement and documents would have remained sealed absent intervention. *See*, *generally*, *Mendez v. City of Gardena*, 222 F. Supp. 3d 782 (C.D. Cal. 2015) (permitting media intervention and order police videos unsealed in civil rights case).

Ordinarily, an applicant seeking permissive intervention under Rule 24(b)(2) must establish: "(1) independent grounds for jurisdiction; (2) the motion is timely; and (3) the applicant's claim or defense, and the main action, have a question of law or a question of fact in common." *Id.* at 788 (internal quotation and citation omitted). In cases involving a challenge of a protective order, however, an applicant need not have an independent ground for jurisdiction or share a question of law or fact in common with the main action. *See Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 473–74 (9th Cir. 1992) (holding that independent jurisdictional basis and strong nexus of fact or law are not required where intervenor merely seeks to challenge a protective order); *Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596, 609 n.25 (1982) ("[R]epresentatives of the press and general public 'must be given an opportunity to be heard on the question of their exclusion.'") (citation omitted).

00200264

The typical requirements for permissive intervention do not apply with literal precision to motions seeking access to judicial records. For such motions, courts "adopt generous interpretations of Rule 24(b) because of the need for 'an effective mechanism for third-party claims of access to information generated through judicial proceedings.'" *EEOC*, 146 F.3d at 1045 (citation and emphasis omitted). Intervention is appropriate because this motion is timely.

This suit concluded by way of a settlement on March 2, 2023. The limited basis for which Media Intervenors seeks to intervene — to unseal the exhibits filed in support of dispositive motions — is unrelated to the merits of the underlying action and did not arise until the Court vacated the hearing date for the motion to unseal. Thus, Media Intervenors are seeking intervention in this matter less than one week after the Court's ruling implicating its substantial First Amendment interest in this matter. Such a de minimus lapse of time between the operative ruling and the present motion does not (and cannot) unduly prejudice the original parties. *See, e.g.*, *Mendez*, 222 F. Supp. 3d at 790 (granting motion to intervene for purposes of unsealing police video footage that was filed months after the parties settled, and noting that other courts "have found a motion to intervene timely even where a non-party intervenes years after the litigation concluded . . .").

Here, Media Intervenors' sole basis for seeking intervention is to challenge the sealing of non-privileged documents. Their status as news publications presents this Court with a significant legal question concerning the appropriateness of the continued confidentiality of those documents. *See Meyer Goldberg, Inc., v. Fisher Foods, Inc.*, 823 F.2d 159, 163 (6th Cir. 1987) ("While a district court has supervisory power over its own records and files, its discretionary powers to seal these records is not insulated from review merely because the judge has discretion in this domain because of the long-established legal tradition which recognizes the presumptive right of the public to inspect and copy . . . ") (internal quotations and citations omitted); *Mendez*, 222 F. Supp. at 788 (media helps public's vigilance in "'keep[ing] a watchful eye on the

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

1    workings of public agencies'"') (quoting *Kamakana v. City & Cnty. of Honolulu*, 447

2    F.3d 1172, 1178 (9th Cir. 2006)). Thus, because Media Intervenors seek to vindicate

3    a substantial right of access to judicial records, and because courts routinely consider

4    such legal claims sufficient under Fed. R. Civ. P. 24(b) to satisfy the "common

5    question of law" requirement for permissive intervention, this element is likewise

6    satisfied.

7         The final consideration in deciding whether to grant permissive intervention is

8    deciding whether the intervention, if granted, would result in undue delay or prejudice

9    to the original parties. Fed. R. Civ. P. 24(b)(3). Here, there is no reasonable argument

10   that granting Media Intervenors permissive intervention for the limited purpose would

11   unduly delay the proceedings. This matter has settled and Media Intervenors do not

12   seek to re-litigate any issues relating to the merits of the underlying claims or

13   challenge the validity of the parties' settlement agreement. Rather, they seek only to

14   assert a collateral claim regarding the validity of shielding the documents related to a

15   public matter. Because granting Media Intervenors' request to intervene for this

16   limited purpose would not require the parties to revisit substantive issues regarding

17   their underlying claims and defenses, and because their request is submitted less than

18   one week after the court vacated the hearing date for the motion to unseal (and while

19   the Court retains continuing jurisdiction over the case), granting Media Intervenors'

20   request for permissive intervention would not result in undue delay. *See*, *e.g.*, *United*

21   *Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir. 1990) (allowing

22   permissive intervention three years after settlement for the purpose of gaining access

23   to discovery materials subject to protective order).

24        Similarly, allowing intervention for a limited purpose would not result in undue

25   prejudice to the original parties in this case. Several courts to have considered the issue

26   have concluded that where, as here, the parties have fully resolved their dispute and

27   the basis for intervention relates solely to a "collateral purpose" such as challenging a

28   confidentiality order, there is no undue prejudice. *See Mendez*, 222 F. Supp. 3d at 790

(finding no prejudice to the parties in allowing intervention because the "underlying case has settled and thus the Media Organizations' intervention would have little effect on the original parties' underlying rights."); *United Nuclear Corp.*, 905 F.2d at 1427 (noting that Rule 24(b)'s timeliness requirement designed "to prevent prejudice in the adjudication of the rights of the existing parties" but that the potential for such prejudice is "not present when the existing parties have settled their dispute and intervention is for a collateral purpose."); *see also Pub. Citizen v. Liggett Grp., Inc.*, 858 F.2d 775, 786 (1st Cir. 1988) (holding that because proposed intervenor "sought to litigate only the issue of the protective order, and not to reopen the merits, we find that its delayed intervention caused little prejudice to the existing parties in this case."); *Liberte Capital Grp., LLC v. Capwill*, 126 Fed. Appx. 214, 220–21 (6th Cir. 2005) (unreported) (finding district court abused its discretion in denying permissive intervention where movant's basis for intervention "would presumably have the sole effect of asking the district court to revisit its decision in an unopposed order and to apprise the judge of case law affecting the order.").

The facts before this Court are similar to those in *Mendez*, in which the district court granted non-party media organizations' motion to intervene for the limited purpose of unsealing police video footage that had been submitted by the parties in connection with a motion for summary judgment. *Mendez*, 222 F. Supp. 3d at 792.

*Mendez* arose from an event in which police officers fired at three suspected burglars who, at that moment, either had their hands placed on top of their heads or had displayed other signs of compliance. *Id.* at 785. Two of the suspects sustained gunshot wounds, and one died. *Id.* Pursuant to a protective order, video footage of the shooting remained under seal when used by the parties in defendants' motion for summary judgment. *Id.* at 787–88. While that motion was pending, the parties settled and plaintiffs voluntarily dismissed their case with prejudice. *Id.* at 788. Shortly thereafter, the media organizations moved to intervene to make public the police video footage. *Id.* at 789.

11

Case No. 3:19-cv-00378-JO-DEB

MEMO ISO INTERVENORS' MOTION TO INTERVENE AND UNSEAL

Acknowledging, like the present circumstances, the surrounding "tension and heightened scrutiny in the wake of several widely publicized and controversial uses of force by the police," the district court rejected defendants' arguments in favor of keeping the footage of the shooting sealed from the public. *Id.* at 785, 789–92. The district court first ruled that defendants' argument on jurisdiction had no merit. *Id.* at 789. And as to defendants' timeliness argument, the court found that even though the media organizations filed their motion months after plaintiffs filed a notice of settlement, "[a] four month delay is not particularly long," and further observed that a motion for intervention had been granted in a different case even "two years after settlement." *Id.* at 790. The district court granted the media organizations' motion to intervene and unsealed the police footage. *Id.* at 792.

For the foregoing reasons, Media Intervenors' request for permissive intervention is timely, is based upon a claim that shares a common question of law with the underlying action, and would not result in undue delay or prejudice to the original parties. As such, Media Intervenors' request for permissive intervention for the limited purpose of challenging the confidentiality of the parties' settlement exhibits should be granted.

## II.   The Court Should Unseal the Exhibits Lodged in Support of Dispositive Motions

Courts have historically recognized a "general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). "Unless a particular court record is one 'traditionally kept secret,' a 'strong presumption in favor of access' is the starting point." *Kamakana*, 447 F.3d at 1178 (quoting *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)). In keeping with the strong public policy favoring access to court records, most judicial records may be sealed only if the court finds "compelling reasons." *Oliner v. Kontrabecki*, 745 F.3d 1024, 1025 (9th Cir. 2014) (citing *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 677–78 (9th Cir. 2010)

BLOOD HURST & O' REARDON, LLP

1   (amended opinion)). However, a less exacting "'good cause'" standard "'applies to

2   private materials unearthed during discovery,'" and to "'previously sealed discovery

3   attached to a nondispositive motion.'" *Id.* (quoting *Pintos*, 605 F.3d at 678). Here,

4   Media Intervenors seek to unseal court records that have been filed in support of

5   dispositive motions adjudicated by this Court. The Court relied on and cited to CIRB

6   materials and there is no indication that they would "gratify private spite, promote

7   public scandal, circulate libelous statements, or release trade secrets." *Kamakana*, 447

8   F.3d at 1179.

9        Admittedly, the public's right to inspect judicial documents is not absolute and

10   courts may, in the exercise of their supervisory authority, deny access under certain

11   circumstances. *Nixon*, 435 U.S. at 598. But in deciding those questions, the legal

12   presumption in favor of openness, "[i]f not 'overpowering' . . . is nonetheless strong

13   and sturdy." *FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987)

14   (citations omitted). "Only the most compelling reasons can justify non-disclosure of

15   judicial records." *In re Knoxville News-Sentinel Co., Inc.*, 723 F.2d 470, 476 (6th Cir.

16   1983) (citing *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1179–80

17   (6th Cir. 1983); *In re Application of Nat'l Broad. Co. (U.S. v. Myers)*, 635 F.2d 945,

18   952 (2d Cir. 1980)).

19        The exhibits in question lie at the heart of the "long-established legal tradition"

20   of allowing public access to judicial records because only with full access to the

21   documents upon which courts rely in making decisions may the public "effectively

22   monitor the activities" of the court. *Pratt & Whitney Canada, Inc. v. U.S.*, 14 Cl. Ct.

23   268, 273 (1988).

24        In addition, where, as here, a government entity is a defendant in a civil case,

25   taxpayers bear the costs of defending the case and of paying out any potential

26   settlement or judgment; thus, the public has an even greater interest in scrutinizing

27   information relevant to the litigation, and understanding the factual and legal basis for

28   its resolution. *See Mendez*, 222 F. Supp. 3d at 792 (public interest favored unsealing

BLOOD HURST & O' REARDON, LLP

police shooting videos that a public agency sought to keep confidential after it settled the litigation because "the fact that they spent the city's money, presumably derived from taxes, only strengthens the public's interest in seeing the videos").

Here, the Court has already determined that the CIRB documents are not attorney-client privileged. The motion to unseal was pending when the case settled. Thus, Media Intervenors are unable to adequately address all of the potential bases upon which that decision rested. However, based on the parties' descriptions of the exhibits and the Court's reliance on these documents it does not appear that any permissible basis exists to overcome the strong presumption of openness applicable to judicial records. Media Intervenors (and the public) clearly possess strong interests in seeing the underlying documents that show how San Diego County responded to in-custody deaths. San Diego County's spending of nearly $8 million to settle this case, presumably money derived from taxes, only strengthens the public's interest in inspecting the CIRB records about the deaths, including the records concerning plaintiff Frankie Greer, who suffered a serious brain injury in his San Diego jail cell after being denied access to his seizure medication.[1] *See Mendez*, 222 F. Supp. 3d at 792.

The public interest is especially strong in assessing how a public agency dealt with deaths that occurred while individuals were in custody of San Diego County. Courts have recognized that "[t]he public has a strong interest in assessing the truthfulness of allegations of official misconduct [by law enforcement personnel], and whether the agencies responsible for investigating and adjudicating complaints of misconduct have acted properly and wisely." *See Welsh v. City & County of San Francisco*, 887 F. Supp. 1293, 1302 (N.D. Cal. 1995); *see also Doe v. Marsalis*, 202

---

[1]     Kelly Davis and Jeff McDonald, "San Diego County will pay almost $8 million to man gravely injured in sheriff's custody," (March 4, 2023), at https://www.sandiegouniontribune.com/news/watchdog/story/2023-03-04/frankie-greer-settlement-sheriff-jail

BLOOD HURST & O' REARDON, LLP

00200264

F.R.D. 233, 230 (N.D. Ill. 2001) ("The public has a right to know whether allegations of police torture [in files] are appropriately investigated and resolved by the City of Chicago").

Law enforcement officers have a unique role in our society. "It is indisputable that law enforcement is a primary function of local government and that the public has a ... great[] interest in the qualifications and conduct of law enforcement officers, even at, and perhaps especially at, an 'on the street' level[.]" *See Gomes v. Fried*, 136 Cal. App. 3d 924, 933 (1982); *see also City of Los Angeles v. Super. Ct.*, 41 Cal. App. 4th 1083, 1091 (1996) ("public interest w[ould] be better served" by the disclosure of information relating to "claims of excessive force in the use of police dogs" by the Los Angeles police than by the concealment of that information).

Given the importance of accountability, particularly from government officials with the power to exercise lethal force, courts should require an even greater countervailing interest to justify withholding from public view information about deaths that occurred while the San Diego Sheriff's Department and its deputies were in charge of the jails. *See*, *e.g.*, *King v. Conde*, 121 F.R.D. 180, 190 (E.D.N.Y. 1988) ("even disclosures having 'some effect on individual liberty or privacy' because of their personal nature are permissible when disclosure serves important public concerns"); *Doe*, 202 F.R.D. at 230. Although "[p]eople in an open society do not demand infallibility from their institutions, [] it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980). These policies weigh heavily in favor of openness here, where the CIRB records will shed light on the problem of in-custody deaths at San Diego jails – which recently led to San Diego County's $7.75 million settlement with a gravely injured man from his time in jail.

Public agencies themselves have called for public disclosure of these CIRB documents. As Mr. Greer pointed out in his motion to unseal, the Citizens Law Enforcement Review Board, the civilian oversight board that monitors the San Diego

1   Sheriff's Department, formally recommended that Sheriff Kelly Martinez release the
2   CIRB reports, particularly of in-custody deaths. ECF No. 337-1 at 8.

3       The Citizens Law Enforcement Review Board's recommendation followed one
4   made by the California state auditor, which released a report last year noting that the
5   185 deaths in San Diego jails from 2006 to 2020 had made the county's jail system
6   the deadliest among California's large county lockups. *Id*. at 9. The auditor wrote "To
7   increase the transparency of Sheriff's Department reviews of in-custody deaths, the
8   legislature should require the Sheriff's Department to either make public the facts it
9   discusses and recommendations it decides upon in the relevant Critical Incident
10  Review Board meetings." *See* Tildon, Michael, San Diego County Sheriff's
11  Department – It Has Failed to Adequately Prevent and Respond to the Deaths of
12  Individuals in Its Custody, AUDITOR OF THE STATE OF CAL., (Feb. 3, 2022)
13  https://www.bsa.ca.gov/reports/2021- 109/index.html#section1.

## CONCLUSION

15      Media Intervenors should be permitted to intervene in this action for the limited
16  purpose of challenging the continued confidentiality of the CIRB reports and those
17  reports and any related documents filed in connection with the dispositive motions
18  should be unsealed. Media Intervenors' request for intervention is timely. Moreover,
19  because Media Intervenors (and the public) enjoy a long-standing right to inspect
20  judicial records that can only be restricted for "the most compelling" reasons, and
21  because no such compelling reasons are present here, Media Intervenors' motion to
22  intervene and unseal CIRB reports should be granted in full.

23                                      Respectfully submitted,

24  Dated: March 20, 2023              BLOOD HURST & O'REARDON, LLP
                                       TIMOTHY G. BLOOD (149343)
25                                     JAMES M. DAVIS (301636)

26

27                                     By:    *s/ Timothy G. Blood*
                                              TIMOTHY G. BLOOD
28
                                       501 West Broadway. Suite 1490

BLOOD HURST & O' REARDON, LLP

San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
jdavis@bholaw.com

*Attorneys for Intervenors The San Diego
Union-Tribune, LLC, Prison Legal News,
and Voice of San Diego*

BLOOD HURST & O' REARDON, LLP

00200264

MEMO ISO INTERVENORS' MOTION TO INTERVENE AND UNSEAL

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 20, 2023.

*s/ Timothy G. Blood*

TIMOTHY G. BLOOD

BLOOD HURST & O'REARDON, LLP
501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com

BLOOD HURST & O' REARDON, LLP

00200264